**Walter DINGER, Plaintiff,**

v.

**ANCHOR MOTOR FREIGHT, INC., Teamsters Local Number 445, Yonkers, New York, Defendants.**

**No. 79 Civ. 3337 (RLC).**

United States District Court, S. D. New York.

Sept. 15, 1980.

Merle E. Davis, White Plains, N. Y., for plaintiff.

Knowles & Allport, Cleveland, Ohio, for defendant Anchor Motor Freight, Inc.; A. Paul Bogaty, New York City, of counsel.

Leaf, Kurzman, Deull & Drogin, New York City, for defendant Union Local 445, I.B.T.; David Kramer, New York City, of counsel.

## OPINION

ROBERT L. CARTER, District Judge.

Walter Dinger was employed as a truck driver at the Tarrytown, New York terminal of defendant Anchor Motor Freight Company ("Anchor") from February, 1977, until he was designated a "voluntary quit" by Anchor on June 12, 1978. Disagreeing with that designation, and asserting that he had been ill that day, Dinger filed a grievance of wrongful discharge with his union, defendant Teamsters Local Number 445 ("the union") which is the recognized bargaining agent for the drivers based at Anchor's Tarrytown terminal.

Under the terms of the collective bargaining agreement ("the agreement") between Anchor and the union,[1] all grievances and disputes arising under the agreement were subject to a contractual grievance pro-

---

1. The collective bargaining agreement between the union and Anchor in force during plaintiff's employment consisted of 3 documents: (1) National Master Automobile Transporters Agreement [hereinafter Master Agreement]; (2) Eastern Conference Area Truckaway, Driveaway, Yard and Shop Supplement to the Master Agreement [hereinafter Eastern Area Agreement]; and (3) Local Rider to the Eastern Area Agreement [hereinafter Local Rider]. These 3 documents will be referred to collectively as the agreement.

cedure [2] that included arbitration by a panel composed of union and management representatives.[3] The agreement also provided that a majority decision of the arbitration panel is final and binding on the parties, including the employee involved.[4]

The hearing on Dinger's grievance of wrongful discharge took place July 18, 1978. Dinger was represented by the president of the local union, and testified under oath. The arbitrators' decision, mailed to the parties on July 20, 1978, stated that Dinger had been a "voluntary quit" for he had left the terminal on June 12, 1978, without explanation; that he had testified during the hearing that he had not reported sick that day, and that he had an "admitted pattern of non–productive past work performance."

Dinger instituted this suit on June 26, 1979, asserting jurisdiction based on the Labor Management Relations Act, 29 U.S.C. § 141, *et seq.* and the United States Arbitration Act, 9 U.S.C. § 1, *et seq.* The complaint named as defendants both Anchor and the union, but asserted no claim against the latter. Plaintiff stated that the union had been joined only as a "necessary" party under Rule 19(a), F.R.Civ.P., because it had been a party to the arbitration.

The complaint alleged that the arbitral decision was erroneous in that plaintiff had been ill and had reported ill on June 12, 1978, and had not been a voluntary quit; that he had not been informed of his right to representation by an attorney at the arbitration hearing and, because of his lack of counsel, had not presented his case well and had made conclusory statements; that the real reason for his discharge had been a vendetta against him "performed by" Anchor's dispatcher in retaliation for Dinger's complaints about certain of Anchor's work practices.

The relief sought was either $25,000 in back pay plus reinstatement by Anchor, or alternatively, a de novo arbitration before a new panel designated by defendants.

The union's answer asked for dismissal of the complaint against it. Anchor filed a pre–answer motion for dismissal of the complaint or for summary judgment.

Anchor's motion was based, *inter alia*, on the following grounds: that to the extent Dinger's suit was an attempt to vacate the arbitration award, it was time–barred; that any suit against Anchor was barred for failure to allege that the union breached its duty of fair representation; and that this court's jurisdiction is preempted by the exclusive jurisdiction granted by Congress to the National Labor Relations Board ("NLRB"), because the employer's actions were arguably an unfair labor practice.

In response to Anchor's motion, Dinger filed a motion for leave to amend his complaint and a cross motion for summary judgment. In support of these motions, plaintiff filed a memorandum of law, a 9(g) statement, and an affidavit of Walter Dinger [hereinafter Plaintiff's Aff.]. The proposed amended complaint differs in two respects from the original complaint. First, it restates the allegation of a vendetta by Anchor's dispatcher to aver that the dispatcher's conduct amounted to "intentionally outrageous conduct and harassment" causing plaintiff emotional pain and suffering. Second, the prayer for relief has been expanded to include a request for $250,000 in punitive damages, and the alternative relief now requested is a de novo arbitration by a court–designated panel of arbitrators.

Because Anchor moved for dismissal or summary judgment before filing its answer, plaintiff was entitled to amend his complaint as of right. Rule 15(a), F.R.Civ.P. Accordingly, leave to amend is granted, and the proposed amended complaint supersedes plaintiff's original pleading.

**2.** Master Agreement, Art. 7, § 1, p. 26 provides "the parties agree that all grievances and questions of interpretation arising from the provisions of this Agreement shall be submitted to the grievance procedure for determination."

**3.** Master Agreement, Art. 7, § 4, pp. 33–34.

**4.** *Id.* at Art. 7, § 6, p. 36.

Both plaintiff and Anchor have renewed their prior motions for summary judgment.[5] In addition, they have filed supplemental memoranda in response to the court's request for briefs addressed to the questions whether the amended complaint states a cause of action for tort liability under New York law, and whether the employer's actions forming the basis of plaintiff's vendetta claim were subject to the grievance–arbitration procedures of the agreement.[6]

The 9(g) statements submitted by the parties in support of their summary judgment motions show that there is no dispute as to any material facts. For the reasons discussed below, defendant Anchor's motion is granted, and plaintiff's is denied.

### 1. *Wrongful Discharge Claim*

Defendant Anchor is entitled to summary judgment as to plaintiff's claims that contest the discharge as wrongful and that challenge the arbitral decision as both erroneous and unfair.

The complaint asserts that jurisdiction is based on the Labor Management Relations Act [LMRA], 29 U.S.C., and the United States Arbitration Act, 9 U.S.C. § 1 *et seq.* but does not specify the relevant statutory sections of those Acts.

To the extent that the wrongful discharge claim is based on the LMRA, it must be considered to be brought pursuant to section 301 of the LMRA, 29 U.S.C. § 185.[7]

#### a. *Failure to allege that union breached its duty*

■ It is well–settled that when an employee's wrongful discharge claim has proceeded to arbitration, the employee can obtain judicial review of the decision only if he alleges both that his discharge was wrongful and that the union breached its duty of fair representation. *Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 567, 96 S.Ct. 1048, 1057, 47 L.Ed.2d 231 (1976); *Vaca v. Sipes,* 386 U.S. 171, 186, 87 S.Ct. 903, 914, 17 L.Ed.2d 842 (1967); *Mitchell v. United Parcel Service, Inc.,* 624 F.2d 394 at 397 (2d Cir. 1980). If the complaint does not allege such wrongdoing by the union, it must be dismissed.

This is because when a collective bargaining agreement contains a provision declaring an arbitral decision to be final and binding, the employer has a right to be protected from relitigation unless the arbitral process has been seriously undermined. *See Hines v. Anchor Motor Freight, Inc., supra,* 424 U.S. at 567–68, 96 S.Ct. at 1057–58.

In the instant case, the agreement provided that grievances involving discharges were to be submitted to the contractual grievance machinery, Eastern Area Agreement, Art. 40, § 4, p. 91, and that the decision of an arbitration panel would be final and binding. Master Agreement, Art. 7, § 6, p. 36.

■ Plaintiff has not only failed to claim that the union breached its duty toward him, he has repeatedly and steadfastly refused to assert any wrongdoing by the union in his case, asserting that he joined the union solely for the purpose of "bringing into court the documentation for the arbitration procedure questioned herein." The

---

5. Because Anchor submitted, and the court has considered, matters outside the pleadings, the motion will be considered as one for summary judgment.

6. These requests by the court resulted from reading the amended portions of the complaint as a colorable attempt by plaintiff to avoid the pre–emption doctrine of *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959) and to come under the exception to pre–emption recognized by *Farmer v. United Brotherhood of Carpenters & Joiners of America,* 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977). *Farmer* held that state courts may, under certain circumstances, entertain tort claims for intentional infliction of emotional distress even when the conduct challenged by such claims could arguably amount to an unfair labor practice as well. Whether this attempt by plaintiff is successful in the instant case will be discussed below.

7. Suits for wrongful discharge may be brought under § 301 as such discharge is a breach of the collective bargaining agreement. *Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 562, 96 S.Ct. 1048, 1055, 47 L.Ed.2d 231 (1976).

arbitral decision is final and *res judicata* as to the issues decided therein. Plaintiff may not relitigate them here.

### b. Statute of Limitations

■ To the extent that plaintiff wishes not to bring a § 301 suit, but merely to vacate the arbitral decision on the grounds of inherent unfairness because he was not informed of his right to counsel, his claim is time–barred. An application to vacate or modify an arbitral award must be made within three months of receipt of the decision under federal law, 9 U.S.C. § 12, and within 90 days under New York law. N.Y. C.P.L.R. § 7511(a); *cf. Barbarino v. Anchor Motor Freight*, 421 F.Supp. 1003, 1006 (W.D.N.Y.1961); *Hana Heating and Air Conditioning Co. v. Sheet Metal Workers International Ass'n*, 378 F.Supp. 1001, 1003–04 (S.D.N.Y.1974) (Brieant, J.).

Defendant Anchor's motion for summary judgment is granted as to plaintiff's claims that he was wrongfully discharged, that his quitting was provoked or justified, and that the arbitration was unfair. Therefore, any claims for reinstatement, backpay or a new arbitration must be dismissed. Defendant Anchor's motion for summary judgment is granted as to plaintiff's wrongful discharge claims. Because plaintiff joined the union as a defendant solely in connection with his claim involving the arbitration hearing, the complaint is dismissed in toto as against the union.

### 2. Intentional Infliction of Emotional Distress

A more difficult and interesting question is presented in relation to plaintiff's claim that defendant's vendetta amounted to outrageous conduct causing him emotional distress.

The complaint does not state this claim in a separate count as required by Rule 10(b), F.R.Civ.P. Nevertheless, reading the complaint leniently, Rule 8(f), F.R.Civ.P., especially in light of plaintiff's memoranda of law, it appears that plaintiff is attempting to state a claim for the common–law tort of intentional infliction of emotional distress. Although the federal claims must be dismissed, the court has subject matter jurisdiction over this state claim based on diversity of citizenship.[8]

Plaintiff's tort allegation is based on a course of conduct by Larry Farrell, Anchor's chief dispatcher, allegedly with Anchor's knowledge, to punish plaintiff for asserting his rights and for criticizing company policies and practices which plaintiff believed to be unfair, unsafe or detrimental to his welfare. Plaintiff alleges that this vendetta was designed to provoke plaintiff into refusing a work assignment and thus into becoming a "voluntary quit."[9] As discussed above, the issues surrounding plaintiff's termination cannot be reviewed here.[10]

---

**8.** Plaintiff is a New York citizen and defendant is a Delaware corporation. Although it is licensed to do business in New York, Anchor has not claimed that its principal place of business is in this state. Therefore diversity jurisdiction exists under 28 U.S.C. § 1332(c). In arguing that no diversity exists because it is licensed to do business in New York, defendant has apparently confused 28 U.S.C. § 1332(c), which governs the citizenship of corporations for purposes of diversity of citizenship, with 28 U.S.C. § 1391(c), which governs venue. 28 U.S.C. § 1332(c) provides that, for diversity purposes, a corporation is a citizen both of the state by which it is incorporated and of the state where it has its principal place of business.

**9.** In addition, plaintiff's affidavit contains a very equivocal statement that may allege that company policy required the drivers to put in longer work hours than permitted by federal law. Plaintiff's Aff. at 7. Plaintiff does not allege, however, that this policy was selectively applied to him.

**10.** It is unclear whether plaintiff presented his vendetta claim to the arbitrators. Defendant's submissions indicate that Anchor is not sure. Plaintiff's assertions in this regard are ambiguous. Of course if plaintiff did present that claim to the arbitrators, he could be collaterally estopped from relitigating it here. However, since the transcript of the hearing has not been submitted, and since the arbitral decision on its face was confined to the questions whether plaintiff was a voluntary quit and nonproductive, I will assume that the actions that form the basis of plaintiff's tort claim were not decided by the arbitrators.

The conduct which plaintiff alleges amounted to intentional infliction of emotional distress consisted of the following acts. First, Farrell allegedly discriminated against plaintiff, as well as other drivers who were not "playing ball with him" by giving them harder and longer trips than he gave to favored employees. It is alleged that Farrell's work distribution procedure was not in accordance with company policy. Plaintiff's Aff. at 3–4. Second, Farrell would not accede to plaintiff's request to drive the same truck as often as possible, a reasonable request in light of "management directives regarding the total plan of work." *Id.* at 7. Third, Farrell scrutinized plaintiff's log book "on the least pretext" to find a basis for charging plaintiff with a violation. *Id.* Fourth, Farrell told plaintiff that he intended to get rid of him because he was non–productive, always sick, and "always had an excuse for not doing this or that." *Id.* at 7–8.

The New York Court of Appeals has recognized that "[a]n action may lie for intentional infliction of severe emotional distress 'for conduct exceeding all bounds usually tolerated by decent society' " *Fischer v. Maloney,* 43 N.Y.S.2d 553, 556, 402 N.Y.S.2d 991, 992, 373 N.E.2d 1215, 1216 (1978), quoting Prosser, *Torts,* 4th ed., § 12. While declining to delineate "the boundaries of this emerging ground of tort liability," *id.* at 557, 402 N.Y.S.2d at 993, 373 N.E.2d at 1217, the court indicated that liability would be found only when the conduct was " 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Id.* at 557, 402 N.Y. S.2d at 993, 373 N.E.2d at 1217, quoting *Restatement of Torts* 2d, § 46[1] and Comment *d.*

The New York courts will not find liability based on intent to cause emotional harm plus the result of emotional distress, absent a showing of egregious conduct. *Id.*

### a. Pre–emption

Defendant asserts two substantive arguments for dismissal of plaintiff's tort claim.

The first ground is that the court's jurisdiction is pre–empted because the NLRB has exclusive jurisdiction over unfair labor practices by employers. Defendant contends that insofar as the company's actions were allegedly done to punish plaintiff for complaining about work conditions, this conduct is arguably an unfair labor practice in violation of section 8(a) of the National Labor Relations Act, 29 U.S.C. § 158(a) ["NLRA"], and this court's jurisdiction is pre–empted under the rule of *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959).

Plaintiff responds that in *Farmer v. United Brotherhood of Carpenters,* 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977), the tort of outrageous conduct causing emotional distress was specifically exempted from *Garmon's* pre–emption rule.

In *Farmer,* the Court held that a tort action for intentional infliction of emotional distress, brought by a union member against his union, could be heard in state court despite the fact that the conduct charged, employment discrimination, also amounted to an unfair labor practice. The court reasoned that a tort action should not be automatically pre–empted when the underlying conduct is not protected under the NLRA; when there is an overriding state interest, "deeply rooted in local feeling and responsibility," in protecting local residents from such conduct; when there is little risk that the state cause of action would interfere with the effective administration of national labor policy; and when the NLRB could not provide the plaintiff with all the relief he sought. *Id.* at 298; *Linn v. Plant Guard Workers,* 383 U.S. 53, 61–63, 86 S.Ct. 657, 662–663, 53 L.Ed.2d 852 (1966) (malicious libel).

The Court, however, noted that when the allegations of tortious acts were made along with employment discrimination claims, a potential for interference with the federal regulatory scheme existed. The Court decided, on the facts of *Farmer,* that the tort action could be resolved without reference to the merits of the underlying labor dis-

pute, and therefore state court jurisdiction was not pre–empted. *Farmer v. Carpenters, supra,* 430 U.S. at 304–05, 97 S.Ct. at 1065–66.

Nevertheless where there is a realistic threat of interference with the federal scheme, state court jurisdiction would not be permitted. *Id.* at 305, 97 S.Ct. at 1066. The Court stated:

Union discrimination in employment opportunities cannot itself form the underlying "outrageous" conduct on which the state court tort action is based; to hold otherwise would undermine the pre–emption principle. Nor can threats of such discrimination suffice to sustain state court jurisdiction. It may well be that the threat, or actuality, of employment discrimination will cause a union member considerable emotional distress and anxiety. But something more is required before concurrent state court jurisdiction can be permitted. Simply stated, it is essential that the state tort be either unrelated to employment discrimination or a function of the particularly abusive manner in which the discrimination is accomplished or threatened rather than a function of the actual or threatened discrimination itself.

*Id.* In a footnote, the Court added:

In view of the potential for interference with the federal scheme of regulation, the trial court should be sensitive to the need to minimize the jury's exposure to evidence of employment discrimination in cases of this sort. Where evidence of discrimination is necessary to establish the context in which the state claim arose, the trial court should instruct the jury that the fact of employment discrimination (as distinguished from attendant tortious conduct under state law) should not enter into the determination of liability or damages.

*Id.* at n. 13, 97 S.Ct. at 1066.

It is possible that under the above–quoted limitations announced in *Farmer,* the court's jurisdiction over the instant case should be pre–empted. Here, if any of the employer's conduct was arguably an unfair labor practice, then all of it was, for it was all allegedly in retaliation for Dinger's assertion of his rights. And the conduct complained of, however maliciously motivated, does not seem to have been done in a sufficiently "abusive manner" to meet the very stringent requirements for stating a tort claim under New York law. *See Fischer v. Maloney, supra,* 43 N.Y.2d at 557, 402 N.Y. S.2d at 992–93, 373 N.E.2d at 1216–17.

On these facts, the pre–emption question is a close one. The summary judgment motion need not be decided on pre–emption grounds, however, for defendant's alternate argument for dismissal is persuasive.

*b. Failure to exhaust contractual grievance remedies*

As an alternative to its pre–emption theory, Anchor contends that the complaint should be dismissed due to plaintiff's total failure to use the compulsory grievance machinery provided under the collective bargaining agreement to resolve the disputes upon which the vendetta claim is based. I agree.

It is settled law that an aggrieved employee cannot seek judicial relief against his employer for breach of a collective bargaining agreement if he has sidestepped the grievance–arbitration machinery which the agreement provides as the employee's exclusive remedy. *Republic Steel Corp. v. Maddox,* 379 U.S. 650, 652–53, 85 S.Ct. 614, 616, 13 L.Ed.2d 580 (1965). This requirement of exhaustion was developed to further the federal policy preferring contract grievance procedures to settle labor disputes. See § 203(d) of the LMRA, 29 U.S.C. § 173(d); § 201(c) of the LMRA, 29 U.S.C. § 171(c); *Republic Steel Corp. v. Maddox, supra,* 379 U.S. at 653, 85 S.Ct. at 616.

The agreement in force between the union and Anchor during the time of plaintiff's employment provided that all grievances and questions of interpretation arising "under, out of, in connection with or in relation to" provisions of that agreement were subject to contractual grievance procedures. Further, such grievance machin-

ery was to be exclusive remedy of parties to the agreement. Master Agreement, Art. 7, § 1 at 26, § 11 at p. 39.

In particular, disputes and employee complaints regarding local dispatch procedures and the propriety of specific dispatch assignments were specifically defined as grievances subject to the contractual dispute resolution procedures. Eastern Area Agreement, Art. 37, § 7 at pp. 84–85; Local Rider, § XII.A. at p. 21. The agreement also contained provisions covering logging and recording time. Eastern Area Agreement, art. 45, art. 47, § 10, at pp. 113–14; Local Rider, Art. 28 at p. 14.

It therefore appears that every act which plaintiff now claims constituted tortious conduct by Farrell toward him was subject to contractual grievance machinery. Plaintiff did not attempt to utilize this machinery as to any of these acts until he was discharged. Indeed, plaintiff concedes that these acts were grievable and that he chose not to report them to the union. Plaintiff's only explanation for this decision is that, in regard to unfair dispatch assignments, he anticipated that the union "might understandably reply that he was taking the whole matter too seriously; and that he should keep trying to avoid confrontations with Larry Farrell, and . . . the personal feud would abate." Plaintiff's Aff. at 6.

It is clear that if plaintiff had challenged the company's conduct as a violation of the collective bargaining agreement, his claim would be barred by the exhaustion doctrine articulated in *Republic Steel Corp. v. Maddox, supra.* I do not see a reason, and plaintiff has offered none, why plaintiff's failure to exhaust his grievance remedies should not also bar a claim framed in terms of tort, at least where, as here, all the acts complained of constituted grievances under the agreement.

Although *Maddox* dealt with a § 301 suit for recovery of severance pay due under a collective bargaining agreement, 379 U.S. at 650, 85 S.Ct. at 615, the Court stated its exhaustion rule as applicable to employee suits which assert "contract grievances."

*Id.* at 652, 85 S.Ct. at 616. Anchor's actions here all constituted contract grievances in that they were all defined as grievances by the agreement.

Furthermore, the underlying reasons stated in *Maddox* for requiring exhaustion of contractual grievance procedures are equally applicable whether the suit sounds in contract or tort: enhancing union status and strength, serving employer interest, and furthering Congressional intent. *Id.* at 653, 85 S.Ct. at 616; *see also Hines v. Anchor Motor Freight, Inc., supra,* 424 U.S. at 567, 96 S.Ct. at 1057.

It is foreseeable and understandable that any employee who allows unresolved grievances to accumulate can reach a point of suffering emotional distress from feeling that he has been repeatedly wronged. *See Magnuson v. Burlington Northern, Inc.,* 576 F.2d 1367, 1369 (9th Cir. 1978). This does not change a contract claim into a tort claim. *Id.* Moreover, to allow him to reach that point without submitting his grievances to the dispute resolution machinery which the union and the employer have chosen as exclusive, and to allow him to proceed in court on a tort theory would deprive both parties to the agreement of the benefit of their bargain. This could result in making employers less willing to bind themselves to exclusive grievance–arbitration machinery, and could undermine the union's position as collective bargaining representative.

In *Magnuson v. Burlington Northern, Inc., supra,* a railroad employee attempted to assert a tort claim of intentional infliction of emotional distress. The Ninth Circuit found that the gravamen of his complaint was wrongful discharge, and that his emotional distress was merely an incident of that wrong. The court dismissed the tort claim, holding that plaintiff was limited to the remedies available through compulsory grievance procedures. In the instant case, the gravamen of the complaint is unfair work assignments and dispatch procedures. It would be improper, in light of *Maddox* and general federal labor policy, to permit this plaintiff to prosecute as a tort

claim a series of acts, each of which could have been resolved through the grievance machinery of the agreement which he deliberately sidestepped.

In summary, plaintiff's wrongful discharge claims must be dismissed both because he has failed to charge the union with wrongdoing and because it is too late to vacate the arbitral decision upholding his voluntary quit designation. The claim of intentional infliction of emotional distress must be dismissed because plaintiff sidestepped the grievance machinery of the agreement. Summary judgment for defendant Anchor is granted.

IT IS SO ORDERED.