Paul Griffith GARLAND, as Administrator of the Estate of Bonnie Joan Garland, Deceased; Paul Griffith Garland and Joan B. Garland, Individually, Plaintiffs,

v.

Richard J. HERRIN, Defendant.

No. 79 Civ. 1384.

United States District Court, S.D. New York.

Jan. 7, 1983.

Boyle, Vogeler & Haimes by Roger Boyle, Kevin J. Farrelly, New York City, for plaintiffs.

Litman, Kaufman & Asche by Russell M. Gioiella, Richard M. Asche, New York City, for defendant.

GRIESA, District Judge.

Plaintiffs have made a motion pursuant to Fed.R.Civ.P. 58 for entry of judgment.

Certain of the issues were previously disposed of on cross-motions for summary judgment. Certain issues were stipulated. Others were tried to a jury. The trial took place on October 12–19, 1982.

The action arises out of the killing of Bonnie Joan Garland on July 7, 1977, by defendant Richard J. Herrin, who was prosecuted in Supreme Court, Westchester County, and was convicted on June 18, 1978 of first degree manslaughter. He is now serving a prison sentence.

The present action is brought by Bonnie's mother and father, Joan B. Garland and Paul Griffith Garland, and by Paul Griffith Garland as administrator of Bonnie's estate. Plaintiffs' complaint originally contained eight causes of action. On October 24, 1979 the court granted summary judgment dismissing the second and eighth causes of action, and the fourth and sixth causes of action have been withdrawn. Defendant consented to summary judgment in favor of plaintiffs on the fifth and seventh causes of action for property damage. The amount of such damages is stipulated. Defendant consented to partial summary judgment on the first cause of action—for wrongful death—on the issue of liability, leaving damages for trial. As to the third cause of action—the claims for infliction of emotional distress—these claims remained for trial on both liability and damages.

At the trial certain elements of damages with respect to the wrongful death claim were stipulated—the amounts relating to

medical expenses and funeral expenses. Since liability was conceded on the wrongful death claim, the only issue submitted to the jury related to the general pecuniary loss suffered by plaintiffs as a result of the death of their daughter. The amount of such damages found by the jury was $10,000.

Defendant has no objection to the entry of judgment in favor of plaintiff Paul Garland as administrator of the estate, based upon the $10,000 wrongful death damage verdict and the other stipulated items.

The contested issue on the present motion for judgment relates to the claims for infliction of emotional distress. Plaintiffs principally rely upon *Restatement of Torts (2d)*, § 46, which states:

"§ 46. Outrageous Conduct Causing Severe Emotional Distress

(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

(2) Where such conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress

(a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, . . ."

It was conceded by defendant at trial that his actions constituted "extreme and outrageous conduct" within the meaning of § 46. With regard to the issue of intention, plaintiffs conceded that defendant did not intend to cause emotional distress to plaintiffs in the sense of desiring to do so. However, plaintiffs contended that defendant had a conscious awareness and knowledge of the severe emotional distress which would be caused to them and that he committed the killing with this state of mind. Plaintiffs contended that this was intentional conduct within the meaning of § 46. Defendant denied such conscious awareness and knowledge. This issue was submitted to the jury, which was asked to answer the following interrogatories:

"1. Do you find that the defendant intended to cause severe emotional distress to plaintiff Paul Griffith Garland—in the sense of knowing that such severe emotional distress would be certain, or substantially certain, to result from his killing of Bonnie Joan Garland?

2. Do you find that the defendant intended to cause severe emotional distress to plaintiff Joan B. Garland—in the sense of knowing that such severe emotional distress would be certain, or substantially certain, to result from his killing of Bonnie Joan Garland?"

With regard to the issue of reckless conduct, it was conceded by defendant that he was guilty of acting recklessly vis-a-vis plaintiffs within the meaning of § 46. However, defendant contends that, as a matter of law, such recklessness is not a basis for imposing judgment against him for the tort of infliction of emotional distress.

In addition to the interrogatories to the jury regarding defendant's knowledge, interrogatories were submitted as to the amount of damages sustained by each plaintiff as a result of emotional distress following Bonnie's death. The interrogatories were:

"3. What amount of damages do you find that plaintiff Paul Griffith Garland sustained as a result of emotional distress following the death of Bonnie Joan Garland?

4. What amount of damages do you find that plaintiff Joan B. Garland sustained as a result of emotional distress following the death of Bonnie Joan Garland?"

With regard to Interrogatories 1 and 2, dealing with defendant's knowledge, the jury answered in the negative. On the damage issue the jury found the amount of $15,000 for each plaintiff, in response to Interrogatories 3 and 4.

The issue to be decided on the present motion is whether reckless misconduct can be the basis for a judgment against defendant on plaintiffs' claims for infliction of emotional distress.

## Facts

The following facts are uncontested. Defendant Herrin and Bonnie met in the fall of 1974 while both were undergraduates at Yale University. They began going together. Herrin visited Bonnie at her home in Scarsdale and became acquainted with her parents. Herrin graduated from Yale in the spring of 1975 and commenced graduate study at Texas Christian University in the fall of that year. Bonnie was still at Yale. Herrin visited the Garland home over the Christmas holidays.

Herrin had an intense affection for Bonnie. He and Bonnie corresponded and visited one another when possible. During the Christmas holidays of 1976 Bonnie and Herrin visited various graduate schools with the idea that they might attend the same school after Bonnie graduated from Yale. Bonnie took an accelerated course load in the hope of graduating in the spring of 1977. However, she was not able to graduate as planned, and made arrangements to attend the session at Yale in the summer of 1977.

Before commencing summer school Bonnie made a six-week tour with the Yale Glee Club in Europe.

At some point the relationship between Bonnie and Herrin began to cool. Bonnie developed a friendship with another man, who was also on tour with the Glee Club in Europe. She apparently did not answer Herrin's letters while she was in Europe.

Bonnie returned home in early July accompanied by the friend from the Yale Glee Club. Aware that she was returning, Herrin traveled to New York from Texas with the intention of visiting Bonnie at her home. On Sunday, July 3, Herrin telephoned the Garland home and reached Mrs. Garland. Bonnie was not at home, but Herrin went to Scarsdale and talked to Mrs. Garland, who told Herrin that Bonnie had a friend staying there. Arrangements were made for Herrin to stay elsewhere.

On July 5 Bonnie's other friend departed, and Herrin came to visit at the Garland home.

On the night of July 6, Herrin and Bonnie were in her bedroom, where an intense discussion of their future relationship took place. Bonnie made it clear that she wished to continue seeing other men as well as Herrin. They were also watching a late night show on television. Bonnie fell asleep. Herrin remained awake and, according to his testimony at the criminal trial, decided that he could not cope with the thought of losing Bonnie. He decided to kill both Bonnie and himself. Herrin left Bonnie's room and made his way downstairs in order to select a weapon. He chose a hammer and brought it back upstairs wrapped in a towel. Mr. and Mrs. Garland were in the house, presumably asleep. While Herrin was carrying the hammer to Bonnie's room he had it wrapped in a towel so that it would be concealed from any family members if they happened to see him. Herrin went back into Bonnie's room, where she was still asleep, and delivered repeated blows to her skull with the hammer. The attack was of the most gruesome nature possible. Bonnie's blood and brains were splattered about the room. These events occurred around 2 a.m. on the morning of July 7. Mr. and Mrs. Garland were oblivious to what was happening at that time.

Herrin escaped in the Garland family car. He did not commit suicide but turned himself in to the police.

Still unaware of the tragedy that had occurred in his daughter's bedroom, Mr. Garland departed in the morning for his office in New York City. At about 8:00 a.m. a policeman came to the home and asked Mrs. Garland if she had a daughter named Bonnie, and if so whether Bonnie was home.

Mrs. Garland rushed to her daughter's room and found a scene of indescribable horror. She saw her daughter's hideously

battered body and the blood and brain-matter, which had been splattered about the room by the force of Herrin's hammer blows. Bonnie, although in the most grievous condition, was still alive, gasping for breath.

Bonnie was taken to a hospital. Mr. Garland was telephoned at his office and immediately departed for the hospital.

Surgery was performed on Bonnie in an attempt to save her life. She remained alive until the evening of July 7, when she died of the massive head injuries.

For Mr. and Mrs. Garland, the day was one of desperate suspense and excruciating emotional pain involved in attending their daughter at times, and in helpless waiting at other times.

This tragedy had serious and continuing effects upon Mr. and Mrs. Garland, which were the subject of substantial testimony at the trial.

*Legal Conclusions*

This case is in the federal court pursuant to diversity of citizenship jurisdiction, and accordingly the law of New York State governs. The precise question to be resolved here has not been squarely addressed by the New York courts, nor in fact by the courts of any other jurisdiction. Consequently, it is necessary to analyze the New York cases which are closest in point and make a judgment as to how the New York courts would rule on the precise issue presented here.

In *Battalla v. State of New York,* 10 N.Y.2d 237, 219 N.Y.S.2d 34, 176 N.E.2d 729 (1961), the New York Court of Appeals dealt with a complaint alleging that the infant plaintiff was negligently secured in a chair lift at a ski resort, and that a problem occurred which caused the plaintiff to become frightened and hysterical, resulting in severe emotional and neurological disturbances with residual physical manifestations. The court reversed the dismissal of the complaint, holding that a valid cause of action was pleaded despite the failure to allege direct physical injury.

In *Halio v. Lurie,* 15 A.D.2d 62, 222 N.Y. S.2d 759 (2d Dep't 1961), the Appellate Division upheld a claim for mental distress and resulting illness caused by certain communications which the defendant sent to the plaintiff, intended to cause anguish and emotional shock. The court stated:

"The question which must be determined therefore is whether the intentional infliction of serious mental distress without physical impact can constitute an independent tort which is actionable per se. We believe that the question must be answered in the affirmative." 15 A.D.2d at 66, 222 N.Y.S.2d at 762.

In both *Battalla* and *Halio* the defendant's conduct was directed exclusively to the plaintiff who claimed the emotional disturbance.

In *Tobin v. Grossman,* 24 N.Y.2d 609, 301 N.Y.S.2d 554, 249 N.E.2d 419 (1969), a mother claimed that she suffered severe emotional distress as a result of witnessing her infant child's negligently inflicted injury. The complaint alleged that the mother was an eyewitness to the injury. However, discovery proceedings showed that the mother was not in fact an eyewitness to the injury, but was nearby when it occurred and observed her child's condition very shortly thereafter. The court held that no cause of action lies for "unintended harm sustained by one, solely as a result of injuries inflicted directly upon another, regardless of the relationship and whether the one was an eyewitness to the incident which resulted in the direct injuries." 24 N.Y.2d at 611, 301 N.Y.S.2d at 555, 249 N.E.2d at 420. The court distinguished the *Battalla* case, and stated: "It is enough that the law establishes liability in favor of those directly or intentionally harmed." 24 N.Y.2d at 619, 301 N.Y.S.2d at 562, 249 N.E.2d at 424.

A later development occurred in *Fischer v. Maloney,* 43 N.Y.2d 553, 402 N.Y.S.2d 991, 373 N.E.2d 1215 (1978). This was an action brought by a tenant of a cooperative corporation who had been sued by the corporation for defamation. That action had been dismissed. Thereafter the tenant sued, claiming that the litigation brought

by the corporation was vexatious and malicious, and constituted, among other things, the tort of intentional infliction of severe emotional distress. The Court of Appeals held that the claim must be dismissed.

The important point about the *Fischer* case, for present purposes, is the court's adoption of the *Restatement of Torts (2d),* § 46, as stating the law of New York as to the tort of infliction of emotional disturbance. The holding of the case was that the pleading did not allege what was required by the *Restatement.* Section 46 has already been quoted above.

While the *Fischer* opinion specifically referred to § 46(1), there is no reason to believe that the New York Court of Appeals would not also approve § 46(2). The court recognized that the law on this subject is in a somewhat early stage of development, stating:

"We do not undertake here to delineate the boundaries of this emerging ground of tort liability." 43 N.Y.2d at 559; 402 N.Y.S.2d at 993, 373 N.E.2d at 1217.

A Southern District decision, *Dinger v. Anchor Motor Freight Co.,* 501 F.Supp. 64, 69 (S.D.N.Y.1980), has noted the *Fischer* decision's approval of § 46 as the law of New York.

■ The necessary meaning of the Court of Appeals' adoption of § 46 is that recklessness is one ground, under the law of New York, for imposing liability for infliction of severe emotional distress, when it is accompanied by extreme and outrageous conduct. It also flows from the *Fischer* case that New York law now recognizes that, under certain circumstances, a plaintiff may recover for the infliction of severe emotional distress where an assault, or other wrongful conduct, is directed at a third person.

■ Although the *Restatement* is not a statute, and thus the same standard of rigorous and precise interpretation is not required of the *Restatement* as would be required in the case of a statute, nevertheless, it is certainly appropriate, in view of the approval of § 46 in the *Fischer* case, to

determine how that section applies to the facts of the present case. As already stated, it is stipulated that Herrin's conduct was extreme and outrageous and was reckless, within the meaning of § 46. Moreover, each of the plaintiffs clearly suffered severe emotional distress. Consequently, the requirements of subsection (1) are met. However, subsection (2) states a qualification where the defendant's conduct is directed at a third person, rather than being directed to the plaintiff. Subsection (2) obviously applies to the facts of the present case, since Herrin's assault was directed at Bonnie, and not to her parents. Subsection (2) provides that, in such a situation, the defendant is liable

"(a) to a member of such person's immediate family who is present at the time, . . ."

The *Restatement* comment about this provision states:

"The cases thus far decided, however, have limited such liability to plaintiffs who were present at the time, as distinguished from those who discover later what has occurred. The limitation may be justified by the practical necessity of drawing the line somewhere, since the number of persons who may suffer emotional distress at the news of an assassination of the President is virtually unlimited, and the distress of a woman who is informed of her husband's murder ten years afterward may lack the guarantee of genuineness which her presence on the spot would afford. The Caveat is intended, however, to leave open the possibility of situations in which presence at the time may not be required." Comment *l,* at 79.

The "Caveat" referred to appears following § 46 and states:

"Caveat:

The Institute expresses no opinion as to whether there may not be other circumstances under which the actor may be subject to liability for the intentional or reckless infliction of emotional distress." *Restatement of Torts (2d),* § 46, at 72.

The discussion by Dean Prosser, the Reporter for *Restatement of Torts (2d)*, suggests that literal presence at the scene of the deed, at its precise instant, should not be required. He states:

"As an additional safeguard, it might be required that the plaintiff be present at the time of the accident or peril, or at least that the shock be fairly contemporaneous with it, rather than follow when the plaintiff is informed of the whole matter at a later date." W. Prosser, *Law of Torts* (4th Ed.1971) at 335.

*See Archibald v. Braverman*, 275 Cal. App.2d 253, 79 Cal.Rptr. 723 (1969) (recovery permitted to mother who, while not actually on scene of accident, appeared moments afterward). It is worth noting that the New York Court of Appeals cites the *Prosser* treatise with approval in the *Fischer* opinion. Although the citation is not to the precise language quoted above, but to an earlier discussion of this subject (p. 56 of the treatise), nevertheless the recognition of *Prosser* as an authority on this subject is significant.

After considering the relevant New York decisions, and the authorities relied on therein, it is this court's conclusion that judgment should be awarded to Mr. and Mrs. Garland on their claim for infliction of severe emotional distress. The crime committed by Herrin was carried out against their daughter in their own home. It was committed at night when they were present in the home, a few feet away from the scene, although they were asleep at the time. Herrin procured the murder weapon in their home and has admitted that he was concerned about being detected by Mr. and Mrs. Garland and thus took steps to mask what he was doing. He took full advantage of the helplessness of Bonnie while she was asleep, and the privacy conferred by the parents being asleep, to commit this act of incredible savagery. Thus Herrin violated in the worst manner the sanctity of the Garland home, not only as to Bonnie, but as to her parents.

Under these circumstances, it would not be expected that Mr. and Mrs. Garland would be literally "present" as eyewitnesses to the crime. Herrin had designed the circumstances to avoid this. However, Mr. and Mrs. Garland were hardly remote from the event.

Not only were Mr. and Mrs. Garland close by in their home at the time of the assault, but they became directly involved in the tragedy shortly thereafter. Mrs. Garland entered Bonnie's room a few hours after the assault, while her daughter was still alive, and struggling for life. Mr. Garland did not observe his daughter in the bedroom, but he rushed from his office in New York City to the hospital immediately upon being notified of what had occurred. Both he and his wife attended Bonnie at the hospital and observed her appalling condition and her struggle. They were present at the hospital when she died there.

As already stated, it is this court's view that the New York courts would recognize recklessness as a basis for imposing liability for infliction of severe emotional distress, where the conduct is extreme and outrageous; and that, under certain circumstances, a plaintiff would be allowed to recover where the assault or other wrongful conduct, was directed to a third person.

 Further, it is this court's view that the New York courts would not limit such recovery to an actual eyewitness to the actions of the defendant against the third person. There is no basis in reason or policy for imposing such a narrow limit. It is obvious that both the New York courts and the drafters of the *Restatement* are concerned about the need to impose appropriate limits on liability for a somewhat intangible injury such as emotional distress. *See Tobin*, 24 N.Y.2d at 615–20, 301 N.Y.S.2d 558–62, 249 N.E.2d at 422–25; *Restatement of Torts (2d)*, § 46, comment *l*. It is certainly not this court's function to attempt a definitive statement of such limits. All that need be said here is that the facts of this case surely come well within whatever boundaries are justified.

Defendant relies heavily upon certain decisions which have not yet been discussed. In *Kalina v. General Hospital*, 31 Misc.2d

18, 220 N.Y.S.2d 733 (Sup.Ct., Onondaga Cty.1961), *aff'd on opinion below,* 13 N.Y.2d 1023, 245 N.Y.S.2d 599, 195 N.E.2d 309 (1963), a Jewish couple claimed, among other things, damages for mental pain and suffering caused by the fact that their infant son had been circumcised without the proper religious ceremony. The claim was dismissed. In *Markowitz v. Fein,* 30 A.D.2d 515, 290 N.Y.S.2d 128 (1st Dep't 1968), plaintiffs were the widow and children of a man who had been shot and killed by the defendant. Plaintiffs' complaint included a claim for mental anguish and suffering, which was dismissed. In *Lauver v. Cornelius,* 85 A.D.2d 866, 446 N.Y.S.2d 456 (3d Dep't 1981), plaintiffs were the parents of infant children, who had been sexually molested by the defendant. Plaintiffs learned of this situation at least two years after it occurred. Their suit included a claim of intentional infliction of emotional harm, which was dismissed.

The *Kalina* case is sharply distinguishable from the present case since the tortious act committed by the hospital was mere negligence. It is difficult to say from the brief factual discussion in *Markowitz* whether or not that case is distinguishable. The main point about *Markowitz* is that it was decided prior to the *Fischer* opinion in the New York Court of Appeals. The same, of course, is true of *Kalina.* On the other hand, *Lauver* was decided after the *Fischer* case. However, it contains no discussion of *Fischer* or of *Restatement of Torts (2d),* § 46. On its facts, it would appear clear that the discovery of an assault two years or more after its occurrence would be beyond what is covered by the *Restatement,* and presents circumstances far different from the *Garland* case.

None of these three cases constitutes controlling or persuasive authority for denying recovery to Mr. and Mrs. Garland on their claims for the infliction of severe emotional distress.

Plaintiffs' motion for entry of judgment is granted.

So ordered.