Louis MAJORS, Plaintiff,

v.

U. S. AIR, INC., Defendant.

Civ. A. No. J-79-1554.

United States District Court,
D. Maryland.

Nov. 5, 1981.

Sol Zalel Rosen, Rockville, Md., for plaintiff.

H. Thomas Howell, Charles E. Iliff, Jr., James L. Shea, Anthony W. Kraus, Semmes, Bowen & Semmes, Baltimore, Md., for defendant.

## MEMORANDUM AND ORDER

SHIRLEY B. JONES, District Judge.

Plaintiff, Louis Majors, brought suit in this Court, pursuant to 28 U.S.C. § 1332, against defendant, Allegheny Airlines, Inc.[1] for false imprisonment and defamation. The complaint states that agents of the defendant took plaintiff to the defendant's security office, held him there against his will, and falsely accused him of stealing property belonging to the defendant. Plaintiff seeks $750,000 in compensatory damages and $750,000 in punitive damages.

Defendant has moved for summary judgment on the grounds that jurisdiction is precluded by the provisions of the Railway Labor Act providing for mandatory arbitration of "minor disputes," and because plaintiff has failed to exhaust his contractual remedies under the collective bargaining agreement. Because this Court holds that jurisdiction is precluded by the arbitration provisions of the Railway Labor Act, it is unnecessary to reach plaintiff's second contention.

Majors was employed by Allegheny as a lead utilityman. On October 12, 1978, Majors found cans of soda near a trash dumpster at work. When he left work later that day, he put the cans in an Allegheny bag and carried them to his car.

David Mann, a security investigator for Allegheny, observed Majors carrying the bag to his car. He and the station superintendent, Woody Poffenberger, followed Majors to his car and asked him for the keys. They then opened his trunk and examined the Allegheny bag, finding the sodas. They informed Majors that the sodas were the property of Allegheny and told him to return to the superintendent's office with them.

1. Subsequent to the filing of this action, Allegheny Airlines, Inc. changes its name to U.S. Air, Inc. For the sake of simplicity, the defendant will continue to be referred to as Allegheny throughout the text of this Memorandum and Order.

During the course of the interrogation that followed, Mann accused Majors of stealing the sodas. When Majors requested that he be allowed to call his attorney, or leave to get his union representative, Mann allegedly responded: "Shut up and don't say nothing. Just sit down." Majors was eventually allowed to leave, and no formal disciplinary action was ever taken against him. He remains employed by Allegheny as a lead utilityman.

■ In 1936, Congress extended coverage of the Railway Labor Act to the air transportation industry. 45 U.S.C. §§ 181–188. One of the primary purposes of the Act is to minimize interruptions in the nation's transportation services by strikes and labor disputes. *International Association of Machinists v. Central Airlines, Inc.*, 372 U.S. 682, 687, 83 S.Ct. 956, 959, 10 L.Ed.2d 67 (1963). To effectuate that purpose, the Act provides for the creation of adjustment boards to arbitrate disputes between employees and carriers "growing out of grievances, or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions ...," 45 U.S.C. § 184, the so-called minor disputes. The arbitration provisions for minor disputes are mandatory, and preempt state remedies. *Andrews v. Louisville & N.R.R.*, 406 U.S. 320, 92 S.Ct. 1562, 32 L.Ed.2d 95 (1972).

Majors argues that he falls within an exception to the general rule that state tort remedies are preempted by the operation of the Railway Labor Act. First, he notes that claims for relief under the Equal Pay Act or the Federal Civil Rights Act have been held not to be preempted by the Railway Labor Act. The simple answer to that argument is that the doctrine of preemption is concerned with the subordination of state law to federal law. While it is true that some courts have held that claims brought under subsequently enacted federal laws are not barred by the mandatory arbitration provisions of the Railway Labor Act, it does not, therefore, follow that state remedies also survive.

Majors' second argument is somewhat more troublesome. He asserts that this case falls within the exception to the rule of preemption carved out in *Farmer v. United Brotherhood of Carpenters*, 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977), *Linn v. Plant Guard Workers*, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966), and *Automobile Workers v. Russell*, 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed.2d 1030 (1958).

■ In *Farmer*, the Supreme Court rejected a formalistic or mechanical approach to questions of preemption in the field of labor relations. Instead, the Court stated that analysis should begin with "a balanced inquiry into such factors as the nature of the federal and state interests in regulation and the potential for interference with federal regulation." 430 U.S. at 300. For a state action to survive, the state must have a substantial interest in the regulation of the conduct at issue, and that interest must not threaten undue interference with the federal regulatory scheme. 430 U.S. at 302, 97 S.Ct. at 1064.

Majors asserts, without explanation, that the state has a substantial interest in protecting its citizens from the abusive conduct he was allegedly subjected to by Allegheny. It is fair to say that the state always has an interest in protecting its residents from tortious conduct; however, *Farmer* requires something more. To avoid preemption, that interest must be "so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act." 430 U.S. at 296–97, 97 S.Ct. at 1061, quoting *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 243–44, 79 S.Ct. 773, 778–79, 3 L.Ed.2d 775 (1959).

■ In his answers to interrogatories, Majors accuses Mann and Poffenberger of falsely accusing him of stealing the sodas in a deliberate attempt to have him charged with the theft, threatening to have him locked up in the airport police station, telephoning Majors' other employer in order to "make it bad" for Majors, and telling Majors to sit down and don't move when he

asked to contact his attorney or Mann "would make it hard" on him. Although this Court does not condone or approve of such conduct, I have grave doubts as to whether it is sufficiently aggravated in nature so as to fall within the *Farmer* doctrine. There is no suggestion that the actions of Mann or Poffenberger involved the violence or threats of violence that characterized the conduct in *Linn* and *Russell*, see 430 U.S. at 299–300, 97 S.Ct. at 1062–63, and it would fall far short of the prerequisite to recovery in *Farmer*, that the conduct be "of such substantial or enduring quality that no reasonable man in a civilized society should be expected to endure it."[2] 430 U.S. at 294, 97 S.Ct. at 1060. The state interest in this case, therefore, is by no means as compelling as in the cases relied upon by Majors.

Assuming, *arguendo*, that the state interest in protecting its citizens from the treatment that Majors was subjected to is so deeply rooted in local feeling as to satisfy the first prong of the *Farmer* test, this Court's jurisdiction is still preempted because of the threat of interference with a federal regulatory scheme. *See* 430 U.S. at 305, 97 S.Ct. at 1066. It is important to note in this regard that the issue in *Farmer, Linn* and *Russell* was whether the state cause of action was preempted by the provisions of the National Labor Relations Act. The scope of that Act is limited to certain specified labor practices, and the state law claims in these three cases could be litigated without deciding whether the conduct in question constituted an unfair labor practice. Because the conduct at issue in *Linn* and *Russell* involved state law principles with only incidental application to conduct occurring in the course of a labor dispute, 430 U.S. at 300, 97 S.Ct. at 1063, and the state court action could be adjudicated in *Farmer* without resolution of the merits of the underlying labor disputes, 430 U.S. at 304, 97 S.Ct. at 1065, there was no real threat of interference with the regulatory scheme of the National Labor Relations Act.

In contrast to the more limited scope of the N.L.R.A., the mandatory arbitration provisions of the Railway Labor Act were created "to provide for the prompt and orderly settlement of *all* disputes growing out of grievances, or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions." 45 U.S.C. § 151a(5) (emphasis added). In *Magnuson v. Burlington Northern, Inc.*, 576 F.2d 1367 (9th Cir. 1978) *cert. denied*, 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323 (1979), the plaintiff was discharged from his position as a train dispatcher after an investigation concluded that he was responsible for a fatal train crash. He brought an action against the railroad for intentional infliction of emotional distress, alleging that Burlington employees had abused the investigatory process and had presented false and misleading evidence at the hearing that led to his discharge.

In deciding that the common law tort was preempted by the arbitration provisions of the Railway Labor Act, the *Magnuson* court noted that to hold otherwise would thwart the congressional purpose of providing a comprehensive federal scheme for the settlement of employer-employee disputes in the railroad industry without resort to the courts. 576 F.2d at 1369. All of the allegedly tortious acts of the defendants were arguably governed by the collective bargaining agreement or had a not insubstantial relationship to the labor contract. 576 F.2d at 1369–70. Consequently, the action was based on a "matrix of facts which are inextricably intertwined with the grievance machinery of the collective bargaining agreement and the R.L.A.," and the *Farmer* exception was held not to apply. 576 F.2d at 1369. The *Magnuson* analysis has been extended to hold actions for defamation preempted by the Railway Labor Act. *See Carson v. Southern Ry.*, 494 F.Supp. 1104 (D.S.C.1979); *Louisville & N.R.R. v. Marshall*, 586 S.W.2d 275 (Ky.App.1979).

**2.** The contrast to Majors' claim for false imprisonment is especially striking, since Maryland law does not require a plaintiff to prove

malice or evil intention. *Fleisher v. Ensminger*, 140 Md. 604, 118 A. 153 (1922).

■ As in *Magnuson*, Majors is complaining about allegedly tortious conduct committed in the course of a company investigation. So long as his claim is founded on some incident of the employment relation, it is immaterial, for purposes of coverage by the Railway Labor Act, whether the claim is expressly covered by the collective bargaining agreement, or is independent of that agreement. *Elgin J. & E. Ry. v. Burley*, 325 U.S. 711, 723, 65 S.Ct. 1282, 1289, 89 L.Ed. 1886 (1945). Investigations of suspected thefts of company property is a normal incident of any employment relationship. This is especially so where, as here, theft is a grounds for discharge under the collective bargaining agreement.[3] Therefore, although that agreement does not speak to the procedures that govern such investigations, the dispute at issue bears a not insubstantial relationship to the labor contract, and this Court's jurisdiction is preempted. Accordingly, defendant's motion for summary judgment will be granted.

---

**3.** Theft of company property is listed as an infraction for which an employee can be discharged in the General Maintenance Manual. It is incorporated into the collective bargaining agreement by Article II, section C of that agreement, which provides: "In the performance of their duties employees covered by this Agreement shall be governed by Company rules, regulations and orders issued by properly designated authorities of the Company, providing such rules, regulations and orders are not in conflict with the terms and conditions of this Agreement.