John Marvin MORRIS and Dorothea Napier Morris, Plaintiffs,

v.

OWENS–ILLINOIS, INC., and Terry L. Wilkison, Defendants.

Civ. A. No. 81–3170–H.

United States District Court, S. D. West Virginia, Huntington Division.

Aug. 9, 1982.

Va., Edward Lloyd Sutter, Senior Atty., Legal Dept., Owens-Illinois, Inc., Toledo, Ohio, for defendants.

## MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

### Introduction

The Plaintiff, John Marvin Morris, brings this action against Owens-Illinois, Inc. (Owens) and Terry Wilkison alleging that Defendants' conduct relating to the circumstances of his discharge from employment caused him to suffer severe emotional distress. Jurisdiction is based on diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(1). The case is presently before the Court on Defendants' motion for summary judgment, as provided by *Rule* 56 of the Federal Rules of Civil Procedure.

### The Parties

Owens-Illinois is a corporation incorporated under the laws of Ohio and has its principal place of business in Toledo, Ohio. Owens operates a glass manufacturing plant in Huntington, West Virginia. Defendant Wilkison was plant manager of that facility during the period involved in this action.

Plaintiff John Marvin Morris was employed by Owens in its Huntington plant as a furnace tender for nearly thirty years, beginning on August 26, 1950, and ending March 20, 1980. Plaintiff Dorothea Napier Morris is the wife of John Marvin Morris. She joins in the complaint with derivative claims of loss of financial support, loss of consortium and emotional distress.

### Opinion

In their memorandum in support of their motion for summary judgment, Defendants argue that Plaintiffs' action is under § 301 of the Labor Management Relations Act for violation of the collective bargaining agreement between Owens and the Glass Bottle Blowers Association, the union representing Plaintiff. Defendants contend that such a suit is dependent upon allegations that the employer repudiated the labor contract or that the union failed in its duty to provide fair representation to the Plaintiff. *Hines*

Helen M. Morris, Baer, Napier & Colburn, L. C., Huntington, W. Va., for plaintiffs.

William C. Beatty, Huddleston, Bolen, Beatty, Porter & Copen, Huntington, W.

*v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976); *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). Defendants also contend that the grievance procedure of the collective bargaining contract provides the exclusive remedy for the conduct complained of by Plaintiff and that federal labor law preempts his state law claim of intentional infliction of emotional distress. This argument involves the so-called *Garmon* doctrine, first set forth by the Supreme Court in *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 13 L.Ed.2d 775 (1959).

The Plaintiff responds that he is not bringing a § 301 suit but is proceeding on the state tort theory of intentional infliction of emotional distress. Plaintiff asserts this cause of action is not preempted by federal labor laws under *Garmon* because of the exception to that principle stated in *Farmer v. United Brotherhood of Carpenters*, 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977).

The question presented to the Court then is part of a continuing problem of deciding, in light of the exclusiveness of comprehensive federal labor laws, "what has been taken from the States and what has been left to them...." *International Association of Machinists v. Gonzales*, 356 U.S. 617, 619, 78 S.Ct. 923, 924, 2 L.Ed.2d 1018 (1958). In order to decide whether Plaintiff's action is preempted a consideration of the exact nature and context of Defendant's conduct is essential. Accordingly, the Court will review the facts extensively.

The complaint alleges that from July, 1979, to March, 1980, the Defendants harassed Plaintiff as follows: Scheduled him to work twelve to sixteen hours a day for several consecutive days; called Plaintiff back to work an eight hour shift just minutes after he had completed two consecutive eight hour shifts; called Plaintiff's home and requested Plaintiff to report for work when Defendant knew or should have known that Plaintiff was at the plant, and; caused Plaintiff to do work that was not in the job description of a furnace tender.

The central allegation of the complaint involves the events leading up to and following Plaintiff's termination on March 20, 1980. On that date Atlee Black, a co-worker of Plaintiff, accused Plaintiff of throwing a metal washer into a feeder of the glass furnace. Relying on this accusation, James Kunkle, Industrial Relations Director at the plant, told Plaintiff to go home for the day and that the matter would be discussed when he returned to work the next day. The complaint also alleges that after the Plaintiff left the plant the Defendants placed a notice in the guardhouse barring Plaintiff from the plant.

Later that day Plaintiff was informed by a union official that he had been discharged. He also learned from others that "it was all over the plant" that he had been fired. Receiving the information that he had been terminated caused Plaintiff great emotional distress and made him anxious as to how he would support his family. The stress became so severe that Plaintiff began having chest pains and was taken to the hospital with what was originally diagnosed as a heart attack, but which was subsequently determined to be a stress or anxiety attack.

The Plaintiff asserts that these actions by Defendants were willful, deliberate and intentional violations of Plaintiff's employment rights in that (1) the collective bargaining contract provided for a suspension prior to investigation and discharge; (2) Owens never fully investigated the incident but rather relied on the unsupported accusation of Black.

On June 17, 1980, Plaintiff notified Kunkle that his physician had released him to return to work. While Kunkle refused to allow Plaintiff to return, he did arrange a meeting with Plaintiff, members of the union and management, and Atlee Black. Although Black said he "might be mistaken" about the incident, Wilkison would not allow Plaintiff to return to work unless Plaintiff admitted to throwing a washer into the feeder. Morris refused to do so, saying he would not admit to something he had not done.

During a subsequent meeting on July 19, 1980, Kunkle advised two members of the union that if Plaintiff would agree to have a disciplinary letter placed in his personnel file he could be returned to work. Plaintiff, maintaining his innocence, refused this offer.

On June 20, 1980, the Defendants told union representatives that no decision had been made to terminate Plaintiff. On June 24, 1980, however, Plaintiff received a letter dated June 20 notifying him of his discharge.

Following his dismissal, Morris applied for unemployment compensation on June 22, 1980. The Defendants protested and a hearing was set for July 15. Plaintiff, his attorneys and two union representatives appeared for the hearing, but Defendants did not attend.

Plaintiff was awarded unemployment compensation as a result of the July 15 hearing and Defendants again protested. Another hearing was scheduled for August 12, 1980, and again Defendants failed to attend. Plaintiff claims these protests were made solely to harass him.

Morris protested his discharge by filing a grievance dated June 24, 1980, pursuant to the collective bargaining agreement then in force between the union and Owens. The grievance was denied by Owens and ultimately the union and Morris invoked arbitration. Before the arbitration hearing, but after a date had been set for it, a settlement agreement with the following terms was proposed:

"1. The company agrees that it will not contest or oppose Mr. Morris' effort to obtain permanent disability retirement and that assuming he is awarded permanent disability retirement, he will receive $7,000 cash payment from the insurance carrier with an additional $8,000 held in reserve for his beneficiary at his death.

2. The company agrees that, in addition to the insurance proceeds, it will pay Mr. Morris two months back wages of approximately $2,600.00.

3. The company further agrees that it will pay Mr. Morris an additional vacation pay of approximately $1,845.00 with his sick leave time credited to his vacation time.

4. The company agrees that Mr. Morris will retain any sick benefits and unemployment compensation payments which he has received and will not be required to repay any such payments or benefits.

5. The company agrees that Mr. Morris will receive monthly retirement payments of between $450.00 and $460.00 per month retroactive to the date of the permanent disability retirement.

6. Mr. Morris agrees that if he is awarded permanent disability retirement, he will withdraw his claim for Workmen's Compensation.

7. Mr. Morris further agrees that if he is awarded permanent disability retirement, he will withdraw his grievance which is presently set for arbitration on January 20, 1981."

Pending the insurance carrier's evaluation of Morris' permanent disability retirement plan as provided in paragraph one of the proposed agreement the parties agreed to a continuance of the arbitration hearing scheduled for January 20, 1980. Morris alleges that on January 19 Kunkle denied that there was an agreement to postpone the arbitration hearing and insisted the hearing be held as scheduled. Plaintiff further alleges that upon learning that he might have to go to Pittsburgh to attend the hearing he suffered emotional distress and anxiety.

The settlement, containing the above quoted terms, was agreed to by the parties in April of 1981. In accord therewith, Owens withdrew the termination which had prompted the grievance and the remaining terms were carried out by the parties without further dispute.

█ As previously noted Owens contends the present action is a suit seeking recovery for breach of a collective bargaining contract under § 301 of the Federal Labor Management Relations Act, 29 U.S.C. § 185. When an employee brings such an

action, because his "claim is based upon breach of a collective bargaining agreement, he is bound by terms of that agreement which govern the manner in which contractual rights may be enforced." *Vaca v. Sipes*, 386 U.S. 171, 185, 87 S.Ct. 903, 914, 17 L.Ed.2d 842 (1967). Therefore, a successful § 301 suit is predicated on allegations that the employer repudiated the collective bargaining agreement or that the union failed to fairly represent the employee in processing the grievance. *Id.; Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976).

█ The pleadings here, however, are silent as to these two essential allegations. Thus, if the case is properly characterized as one under § 301, as Owens contends it should be, their motion for summary judgment would clearly merit favorable action by the Court. The Court, however, is not persuaded by the Defendants' argument. The complaint is totally silent as to § 301, does not request back pay, reinstatement or any right secured by the collective bargaining agreement. Rather the Plaintiffs have limited their pleadings to a recitation of the conduct of the Defendants necessary to their attempt to state a claim for intentional infliction of emotional distress. While the Plaintiffs do refer to violations of the collective bargaining contract, [see complaint at paragraphs IV(a) and IV(C)(1), (2) and (3)] they do so only to the extent to which these issues are inextricably meshed with their tort claim. The Court then will consider this action as one for intentional infliction of emotional distress, and not as a § 301 claim.

In attempting to bring a civil action based on an employer's conduct which is arguably within the ambit of federal labor law, the Plaintiffs are confronted with the *Garmon* doctrine:

"When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must

yield. To leave the States free to regulate conduct so plainly within the central aim of federal regulation involves too great a danger of conflict between power asserted by Congress, and requirements imposed by state law."

*Farmer v. United Brotherhood of Carpenters*, 430 U.S. 290, 296, 97 S.Ct. 1056, 1061, 51 L.Ed.2d 338 (1977), *quoting San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 244, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959). This doctrine was established to prevent the "conflict of two law-enforcing authorities, with the disharmonies inherent in two systems, one federal the other state, of inconsistent standards of substantive law and remedial schemes" that would result if state laws were allowed to interfere with the comprehensive federal labor law scheme. *Garmon* at 242, 79 S.Ct. at 778.

Morris seeks to escape the preemption of his state tort claim that would normally be required by *Garmon* by asserting that his action falls under the exception to that doctrine created by the Supreme Court in *Farmer v. United Brotherhood of Carpenters, supra*. Because the facts here differ in significant aspects from those in *Farmer* the Court is unable to agree with Plaintiffs' claim of exemption.

*Farmer* involved a union official's suit against his own union for discrimination in hiring hall practices. *Farmer* did not deal with a collective bargaining agreement providing an exclusive grievance procedure for settling disputes arising in the workplace as does the case at bar. This distinction is important in light of the congressional policy that the grievance procedure provided in the labor contract is the preferred method of settling labor disputes. *Hines v. Anchor Motor Freight, supra*, 424 U.S. at 562, 96 S.Ct. at 1055. This policy "can be effectuated only if the means chosen by the parties for settlement of their differences under a collective bargaining agreement is given full play." *United Steelworkers v. American Manufacturing Company*, 363 U.S. 564, 566, 80 S.Ct. 1343, 1345, 4 L.Ed.2d 1403 (1960).

That the actions of Owens for which Plaintiff now seeks recovery were covered by the collective bargaining agreement is apparent from Morris' own actions in filing grievances to protest Owens' conduct. On February 8, 1980, Morris filed a grievance to protest his being assigned work that he considered not within his job description of furnace tender. This grievance was taken through the first three steps of the grievance procedure until it was withdrawn by the union's international representative. Morris also filed a grievance dated June 24, 1980, to contest what is obviously the gravaman of this action, his discharge from employment. The resolution of that grievance to a satisfactory conclusion has already been outlined above.

The Ninth Circuit in *Magnuson v. Burlington Northern, Inc.*, 576 F.2d 1367 (9th Cir.), *cert. denied* 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323 (1978) had occasion to distinguish a case quite similar to this one from *Farmer.* In that case Magnuson had been dismissed for his part in a head-on collision between two freight trains. He brought a common law intentional infliction of mental distress action against his former employer alleging there was a conspiracy to discharge him. The district court dismissed his complaint and Magnuson appealed. The Ninth Circuit affirmed, pointing out that Magnuson's reliance on the *Farmer* exception was ill-founded, "[t]he alleged wrong by the union officials [in *Farmer*] was not a grievance that was expressly covered by any provision of the N.L.R.A., and was only related tangentially to unfair labor practices which could have been made the subject of proceedings under the Act." *Id.*, at 1369. *Accord Majors v. U. S. Air, Inc.*, 525 F.Supp. 853 (D.Md.1981); *Dinger v. Anchor Motor Freight, Inc.*, 501 F.Supp. 64 (S.D.N.Y.1980); *Carson v. Southern Railway Co.*, 494 F.Supp. 1104 (D.S.C.1979). The Court went on to say that "[U]nlike *Farmer*, this action is based on a matrix of facts which are inextricably intertwined with the grievance machinery of the collective bargaining agreement ...." *Id.*

The same distinction drawn by the Court in *Magnuson* applies here. The complaint and Morris' affidavit reveal that the gravamen of this action stems from Morris' discharge on March 20, 1980. It was upon learning of this termination that Plaintiff suffered an anxiety attack and it is from this incident that his other claims spring. Morris made this discharge the subject of a grievance from which he ultimately received compensation. The conduct which is the subject of Morris' complaint, then, is, like that in *Magnuson*, "inextricably intertwined with the grievance machinery of the collective bargaining contract" and, therefore, subject to preemption. *See also United Credit Bureau v. NLRB*, 643 F.2d 1017, 1026 (4th Cir. 1981).

To the extent that Morris did not make other disputes, such as being called to work consecutive shifts, the subjects of grievances, is, simply stated, his own fault. While the Court understands the natural hesitancy to file grievance after grievance, the resulting accumulation of disputes does not change the fact that these matters are to be settled through the procedure provided in the collective bargaining contract and not in the courts. As stated in *Dinger v. Anchor Motor Freight*, 501 F.Supp. 64, 71 (S.D.N.Y.1980):

"It is foreseeable and understandable that any employee who allows unresolved grievances to accumulate can reach a point of suffering emotional distress from feeling that he has been repeatedly wronged. *See Magnuson v. Burlington Northern, Inc.*, 576 F.2d 1367, 1369 (9th Cir. 1978). This does not change a contract claim into a tort claim. *Id.* Moreover, to allow him to reach that point without submitting his grievances to the dispute resolution machinery which the union and the employer have chosen as exclusive, and to allow him to proceed in court on a tort theory would deprive both parties to the agreement of the benefit of their bargains."

Of the cases cited by Plaintiff in support of the contention that the present action is not preempted *Anthan v. Professional Air*

*Traffic Controllers Organization,* 672 F.2d 706 (8th Cir. 1982); *Linn v. Plant Guard Workers,* 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966); *Automobile Workers v. Russell,* 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed.2d 1030 (1958); and *International Association of Machinists v. Gonzales, supra,* lack persuasive authority for the reasons outlined in *Magnuson* and discussed above—these cases did not involve a collective bargaining contract or an exclusive grievance procedure that is so deeply rooted in the facts of this case.

The only case cited by Plaintiff involving a collective bargaining contract is *Peabody v. A. V. Dollar,* 666 F.2d 1309 (10th Cir. 1981). That case involved an Oklahoma statute which created a cause of action against any employer who discharged an employee in retaliation for the employee's filing of a workmen's compensation claim. The court held that actions under the statute were not preempted by federal labor law.

The inapplicability of this case to the one at bar can be illustrated by examining the reason for the court's decision. Essentially, the court reasoned that suits under the statute would impede "neither collective bargaining nor any of the policies and purposes of the federal statute." *Id.* at 1313. The court also noted that the remedy being pursued in those suits "in no way conflicts with the collective bargaining agreement or with the National Labor Relations Act." *Id.* So, far from supporting the proposition that suits based on facts closely connected with a collective bargaining agreement or grievance procedure are not preempted, an argument could be made that *Peabody* stands for the contrary. For implicit in the court's reasoning is the idea that if the action did directly involve the grievance procedure or a collective bargaining contract it *would be* preempted.

Assuming, *arguendo,* that the *Farmer* exception was otherwise applicable to this case there is a further requirement imposed by that case that has not been met by Plaintiff. In discussing the union discrimination that was both the subject of the tort action and arguably a violation of federal labor law, the Court stated, "It is essential that the state tort be either unrelated to employment discrimination or a function of the particularly abusive manner in which the discrimination is accomplished." *Farmer* 430 U.S. at 305, 97 S.Ct. at 1066. The tort alleged here is certainly not unrelated to the action of the employer that might potentially be declared an unfair labor practice or made the subject of a grievance. It was, in fact, the identical action of the employer, terminating Morris, that is the basis of both the tort action and the grievance.

█ Plaintiff then is relegated to the alternative requirement of showing the employer acted in a "particularly abusive manner." Plaintiffs, however, have asserted no conduct by Owens that can be reasonably interpreted as sufficiently abusive to meet this test. The case of *Majors v. U. S. Air, Inc.,* 525 F.Supp. 853 (D.Md.1981) is illustrative of this point. Majors was accused of stealing several cans of soda from his employer. He was detained in a superintendent's office where he was interrogated. A security investigator for the company threatened to have him locked up in the airport police station and to call Majors' other employer in order to "make it bad" for Majors. When he requested to be allowed to contact his attorney Majors was told to "shut up and don't say nothing. Just sit down." *Id.* at 855. Although those facts present a much better case than the present one for a finding of "particularly abusive" conduct, the court in *Majors* expressed grave doubts as to whether the actions were "sufficiently aggravated in nature so as to fall within the *Farmer* doctrine." *Id.* at 856. *See also Dinger v. Anchor Motor Freight, supra.* Owens' conduct as described by Plaintiff, and recounted in detail above, while perhaps not in accord with what one might consider appropriate in dealing with an employee of nearly thirty years, does not fall within the type of "particularly abusive" activity described by the court in *Farmer.*

For the reasons discussed above, the Defendants' motion for summary judgment is hereby GRANTED.