[L.A. No. 32150. Mar. 23, 1987.]

JOHN DeTOMASO, Plaintiff and Appellant, v.
PAN AMERICAN WORLD AIRWAYS, INC., Defendant and
Appellant.

518

## COUNSEL

Robert N. Cleaves for Plaintiff and Appellant.

Wilma B. Liebman, Deborah S. Merkel, George A. Pappy and Pappy & Davis as Amici Curiae on behalf of Plaintiff and Appellant.

Belcher, Henzie & Biegenzahn, Belcher, Henzie, Biegenzahn & Walker, George M. Henzie and James Derr for Defendant and Appellant.

David A. Berg, James L. Casey, Shirley M. Hufstedler, Hufstedler, Miller, Carlson & Beardsley and John M. Meenan as Amici Curiae on behalf of Defendant and Appellant.

Marsha S. Berzon and Laurence Gold as Amici Curiae.

## OPINION

PANELLI, J.—In this action for breach of warranty of title, defamation, and intentional infliction of emotional distress, Pan American World Airways, Inc. (Pan Am) seeks review of the Court of Appeal's decision (1) setting aside an order conditionally granting Pan Am's motion for new trial on the issue of damages, (2) affirming and reinstating the judgment on the verdict, and (3) holding that employee John DeTomaso's tort claims were not preempted by the Railway Labor Act (45 U.S.C. § 151 et seq., hereafter sometimes referred to as RLA or Act).

■ ■■■■ We granted review in order to resolve a conflict among the Courts of Appeal as to when state tort claims are preempted by the RLA.[1] As explained hereafter, we conclude that on the facts presented in this case the intentional infliction of emotional distress and defamation claims are preempted.[2]

## FACTS

DeTomaso worked in Pan Am's Los Angeles cargo department. On September 15, 1978, he purchased a bin of abandoned cargo from Pan Am for $100.[3] He made the purchase through Don Roark, a supervisor in the cargo department. Four days later, he paid $200 for two more bins of what he and Roark believed to be abandoned cargo.

Before DeTomaso's purchases, William Lasso, a cargo department employee, had prepared an inventory of shipments that had been in the ware-

---

[1] The RLA preemption issue was first raised in Pan Am's trial brief. DeTomaso claims that, since the issue was not specifically pleaded as an affirmative defense, it was waived. Whether or not tort claims are preempted by the RLA is a question of subject matter jurisdiction (*Beers* v. *Southern Pacific Transp. Co.* (9th Cir. 1983) 703 F.2d 425, 429), which cannot be waived. (*Summers* v. *Superior Court* (1959) 53 Cal.2d 295, 298 [1 Cal.Rptr. 324, 347 P.2d 668].)

[2] Although other issues were raised in the parties' briefs, we ordered that "pursuant to rule 29.2(b) of the California Rules of Court, oral argument . . . will be limited to the issue of whether an employee's claims for intentional infliction of emotional distress and defamation are preempted by the Railway Labor Act (45 U.S.C. § 151 et seq.) when those claims arose out of the employer's investigation into conduct by the employee that might be grounds for discharge."

The parties have questioned whether our reference to "oral argument" meant that they were still free to submit briefs on the other issues. The answer is given in the text of rule 29.2(b) which, after referring to the court's ability to specify "the issues to be argued," states: "Unless otherwise ordered, briefs on the merits and oral argument shall be confined to the specified issues and issues fairly included in them."

In this case, we intended by our order to limit oral argument and briefing to the issue specified—preemption.

[3] The parties stipulated at trial that there was no restriction on employee purchases of abandoned cargo.

house for an unusually long time. Lasso placed the inventoried shipments in bins on the upper level of a cargo rack near the salvage bins, with a sign stating, "All transfers. Do not touch." Transfers were items to be transferred to other carriers who would transport them to cities not served by Pan Am.

One of the inventory items found in DeTomaso's bins was a shipment of 13,000 Sylva Cell batteries. Shortly after his purchase, in an effort to sell these batteries, DeTomaso contacted a Texas Instruments representative in Lubbock, Texas. The representative informed him that similar batteries had been noted as a delinquent shipment. DeTomaso told the representative that he had purchased the batteries in salvage and that he would be willing to sell them to Texas Instruments if the company was interested in repurchasing them. DeTomaso testified that before the phone call he was unaware that the batteries were originally to be shipped to Texas Instruments. The batteries were, however, on record as having been transferred by Pan Am to Continental Airlines (Continental). Continental had received a claim of loss for the batteries from Texas Instruments.

DeTomaso did not hear from the Texas Instruments representative again. Instead, on October 16, 1978, he received a call from Continental. The caller asked DeTomaso where and how he had obtained the batteries. DeTomaso replied that he had purchased them from salvage and would have the seller contact Continental. DeTomaso did not, however, testify he told anyone at Pan Am about this call.

Continental contacted the Federal Bureau of Investigation (F.B.I.) at the Los Angeles International Airport. The F.B.I., in turn, contacted Pan Am's director of security, Jim Startzell. Startzell and F.B.I. Agent Tim O'Neill interviewed DeTomaso on October 17, 1978. During the interview, DeTomaso told Startzell and O'Neill that all the cargo he had purchased was stored in his garage. He offered to show it to them.

Once inside the garage, Startzell conducted an inventory of the cartons that had identifiable air waybill numbers.[4] Some, including seven cartons containing the batteries, appeared to be part of recent shipments. O'Neill confiscated the batteries and delivered them to Continental.

DeTomaso's 10-year-old son, Sean, was present in the garage during the investigation. Startzell said something to DeTomaso that Sean interpreted as an accusation of theft.[5] Both Sean and DeTomaso's wife, Carla, testified that after the investigation the family relationship deteriorated.

---

[4] Air waybill numbers are small adhesive labels placed on cargo cartons for identification.
[5] It is unclear exactly what statements Sean interpreted as an accusation. Startzell testified that DeTomaso asked if he was in trouble. Startzell replied, " 'I don't know if you're in trou-

In November 1978, DeTomaso began experiencing physical pain. He ultimately was hospitalized for the removal of his appendix and of a growth on his intestine. At trial a psychiatrist whom DeTomaso had consulted in 1980, some two years after the operation, opined that DeTomaso's physical pain and appendicitis were caused by Pan Am's conduct, as was his continued depression and physical discomfort.

All employees of the cargo department in Los Angeles are represented by the Teamster's Union, Local 2707. As required by the RLA (45 U.S.C. § 152 First), the union and airline were parties to a collective bargaining agreement (the agreement). The agreement provided that no employee could be disciplined or discharged without "investigation by a recognized official of the [airline]." In the event an employee was to be disciplined or discharged, specified procedures were to be followed. Further, an employee who believed "that he [had] been unjustly dealt with" or that any provision of the agreement "[had] not been properly applied or interpreted" could present a grievance.

Pan Am suspected that DeTomaso had obtained by questionable means, not only the battery shipment, but possibly other items which were found in his garage. As a result, as required by the agreement, Pan Am investigated further into the October salvage purchases in order to determine whether to discharge or otherwise discipline DeTomaso. Twice during the investigation Pan Am officials contacted the local union representative, Saroop Chandiramani, to inform him that the company was considering discharging DeTomaso for theft.

Although the terms of the agreement did not expressly require such calls when an investigation of an employee represented by the union was underway, an informal agreement did. According to Chandiramani, such calls—known as "courtesy calls"—were a customary part of the pretermination procedures established between the airline and union. If such calls were not made, the union "would have a legitimate disagreement" with Pan Am.

Sometime early in January 1979, a meeting was held at which DeTomaso, Chandiramani, Startzell and other Pan Am officials were present. The meeting, like the calls, was an informal but customary part of established pretermination procedures.

In the course of the meeting, Startzell stated that DeTomaso was being discharged because of his involvement in the theft of the batteries. Chandi-

---

ble, but somebody's in trouble because this Texas Instruments shipment should not have been here.' " DeTomaso testified that Startzell stated that it *appeared* that he had stolen the batteries and that, since there were air waybill numbers on the cartons, he had *probably* taken them. Sean testified simply that Startzell had "accused his father of stealing."

ramani noted the harsh implications of that statement. Startzell explained that he did not necessarily mean that DeTomaso was a thief, but that the circumstances pointed to a theft somewhere in the chain of events that led to the presence of the batteries in DeTomaso's garage.

By letter of January 11, 1979, DeTomaso was notified that he had been discharged, as of that day, for "fraud, dishonesty and abuse of company policy." The same day, DeTomaso filed a grievance claiming his termination by Pan Am violated the agreement. The grievance form also designated his union local to act on his behalf "in the disposition and settling of this grievance." The grievance form was signed by DeTomaso and Chandiramani as the union business agent. Following a grievance hearing, the grievance was denied on the ground that DeTomaso's actions were in violation of Pan Am's employee rules of conduct.

Pursuant to the provisions of the agreement, DeTomaso appealed to the Western Regional Field Board of Adjustment on March 9, 1979. At that hearing a settlement was reached. In exchange for withdrawal of the grievance, DeTomaso would be reinstated and made whole. Accordingly, Pan Am removed the termination letter from DeTomaso's file, retroactively restored his seniority and benefits, and reinstated him to the payroll with backpay.

On December 22, 1978, prior to his discharge, DeTomaso had filed a civil complaint seeking damages for Pan Am's alleged breach of warranty of title to the battery shipment. On February 15, 1979, after his discharge but before settlement of the grievance, he filed a first amended complaint, which added causes of action for defamation and for negligent and intentional infliction of emotional distress. On June 8, 1979, DeTomaso filed a second amended complaint deleting the causes of action for negligent infliction of emotional distress and for damages related to lost wages and employment benefits resulting from his discharge. Even so, the allegation giving rise to the intentional infliction of emotional distress cause of action was that "defendants wrongfully fired plaintiff from his job and falsely accused plaintiff of fraud, dishonesty and abuse of company policy as the basis for his discharge." The causes of action in the second amended complaint were tried before a jury in September 1983.

By the close of the evidence at trial, the court determined that the defamation cause of action could not stand as pleaded. However, plaintiff was allowed to amend his pleading to charge that Startzell's statements in the garage, overheard by DeTomaso's son, constituted defamation. Those statements were not alleged to constitute intentional infliction of emotional distress.

A divided jury awarded DeTomaso a lump sum of $265,000 general damages and $300,000 punitive damages. Since a general verdict was returned, no allocation of damages was made to either the tort or warranty causes of action, nor did the verdict indicate which cause of action formed the basis of liability.

Pan Am moved for judgment notwithstanding the verdict or, in the alternative, for new trial or remittitur. At the hearing on the motions, the court stated that it was "amazed at the amount of damages . . . awarded in this trial . . . [and could] only conclude that this verdict by this jury was given under passion and prejudice. It's a very excessive verdict under the evidence." The court, without a statement of reasons, granted the motion for new trial on the limited issue of damages, subject to the condition that if DeTomaso would agree to accept a remittitur by a reduction of $358,393 the motion would be denied.

DeTomaso refused to accept the remittitur. Instead, he appealed on the ground that the order failed to comply with section 657 of the Code of Civil Procedure.[6]

Pan Am conceded the deficiency of the order, but cross-appealed, arguing, inter alia, that the RLA preempted DeTomaso's tort claims. The Court of Appeal rejected Pan Am's argument and reinstated the judgment due to the trial court's failure to comply with Code of Civil Procedure section 657. We now review the propriety of the Court of Appeal's conclusion that DeTomaso's tort claims were not preempted. .

## DISCUSSION

### I.  *History and Background.*

The RLA was passed in 1926, in the wake of the Railway Shopmen's Strike. (1 Morris, The Developing Labor Law (2d ed. 1983) p. 20.) "The Railway Labor Act was not [so much] an expression of social concern or an attempt to assist a disfavored combatant in the industrial relations struggle [as] a legislative attempt to stabilize industrial relations patterns and extend periods during which the parties themselves could work out a peaceful solution to their disputes." (18H Kheel, Labor Law (1986) § 50.02, p. 50-4 (hereafter Kheel).)

---

[6] Section 657 provides, in pertinent part: "When a new trial is granted, on all or part of the issues, the court shall specify the ground or grounds upon which it is granted and the court's reason or reasons for granting the new trial upon each ground stated."

A primary purpose of the Act is "to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions." (45 U.S.C. § 151a(5).) Such disputes are known as "'minor disputes.'"[7] (*Frandsen* v. *Broth. of Ry., Airline & S.S. Clerks* (7th Cir. 1986) 782 F.2d 674, 685; *Kaschak* v. *Consolidated Rail Corp.* (6th Cir. 1983) 707 F.2d 902, 904; 18H Kheel, *supra,* § 50.05 [1], at p. 50-23; 1 Morris, *supra,* at p. 20.)

Initially, the Act merely *encouraged* carriers and their employees to enter into arbitration agreements for resolution of minor disputes. (Act of May 20, 1926, Pub.L. No. 69-257, § 5, 44 Stat. 577.) "Because of its completely voluntary nature, however, this scheme resulted in difficulties and labor unrest." (18E Kheel, *supra,* § 26.02[2], at p. 26-24.) Consequently, in 1934 the Act was amended to establish the National Railroad Adjustment Board and to require carriers to participate in the administrative procedures established by the Act for the resolution of minor disputes. (Act of June 21, 1934, Pub.L. No. 73-442, § 3, 48 Stat. 1185; *Union Pacific R. Co.* v. *Price* (1959) 360 U.S. 601, 612 [3 L.Ed.2d 1460, 1467, 79 S.Ct. 1351]; 18E Kheel, *supra,* at p. 26-24.)

In 1936 the Act was extended to encompass the airline industry. (45 U.S.C. § 181 et seq.) Although no permanent national board of adjustment has been established for the airline industry, individual carriers and their employees are under a statutory duty to establish "system, group or regional boards of adjustment" for resolution of minor disputes. (45 U.S.C. § 184; see also *Machinists* v. *Central Airlines* (1963) 372 U.S. 682, 686 [10 L.Ed.2d 67, 71, 83 S.Ct. 956].) The Regional Field Board of Adjustment is such an entity.

The RLA directs that minor disputes be settled "on the property in the usual manner, but failing adjustment either party [can] take the matter to the adjustment board [created] to hear and decide it." (*Machinists* v. *Central Airlines, supra,* 372 U.S. at p. 689 [10 L.Ed.2d at p. 73]; 45 U.S.C. §§ 153 First (i), 184.)

■ Under the RLA the role of courts in the area of minor disputes is extremely limited. Generally, courts will intervene only to determine the validity of an underlying contract (see e.g., *Machinists* v. *Central Airlines, supra,* 372 U.S. 682), to enforce a board of adjustment award (see e.g.

---

[7]"Major disputes" involve the negotiation of collective bargaining agreements. (18H Kheel, *supra,* § 50.05[1], at p. 50-23.)

*Brotherhood of Rail. Train.* v. *Denver & R. G. W. R. Co.* (10th Cir. 1966) 370 F.2d 833, 836), or to provide the limited review permitted by the Act.[8]

■ Congress considered it essential to keep so-called minor disputes within the boards of adjustment and out of the courts because finality of administrative determinations is essential to the boards in fulfilling their task of promoting stability in the air and rail carrier industries. (*Union Pacific R. Co.* v. *Sheehan, supra,* 439 U.S. 89, 94 [58 L.Ed.2d 354, 359, 99 S.Ct. 399]; see also *Gunther* v. *San Diego & A. E. R. Co.* (1965) 382 U.S. 257, 263 [15 L.Ed.2d 308, 312, 86 S.Ct. 368]; *Evans* v. *Missouri Pacific R. Co.* (E.D.Mo. 1985) 618 F.Supp. 930, 931-932.) When the RLA mandates that a claim be resolved by resort to arbitration and grievance procedures, those procedures are the exclusive remedy available to the claimant. (*Andrews* v. *Louisville & Nashville R. Co.* (1972) 406 U.S. 320, 325 [32 L.Ed.2d 95, 100, 92 S.Ct. 1562].)

Thus, the question we must answer here is whether the acts alleged in DeTomaso's tort causes of action are inextricably intertwined with the provisions of the collective bargaining agreement, so as to be governed by the grievance and arbitration procedures set forth therein. For the reasons hereinafter stated, we conclude they are.

## II. *Characterization of Claims.*

■ "[T]he line between a tort actionable in court and an employment dispute actionable only in a grievance arbitration proceeding is . . . not sharp, except in extreme cases." (*Lancaster* v. *Norfolk and Western Ry. Co.* (7th Cir. 1985) 773 F.2d 807, 814.)

The starting point of preemption analysis is the United States Supreme Court's decision in *Andrews* v. *Louisville & Nashville R. Co., supra,* 406 U.S. 320. There, plaintiff brought an action for wrongful discharge against his employer when the employer refused to allow him to return to work after he recovered from an injury. The court held that the only source of plaintiff's right not to be discharged was the collective bargaining agreement. (*Id.* at p. 324 [32 L.Ed.2d at p. 99].) Accordingly, the existence and extent of any obligation to restore the employee to his regular duties after recovery from the injuries would depend on an interpretation of that agreement. As such, the claim was subject to the Act's arbitration requirement. (*Ibid.*) "The fact

---

[8] Under the RLA, a court reviewing the decision of a board of adjustment may set aside the decision only for "failure of the [board] to comply with the requirements of this chapter, for failure of the order to conform, or confine itself, to matters within the scope of the [board]'s jurisdiction, or for fraud or corruption by a member of the [board] making the order." (45 U.S.C. § 153 First (p).)

that [the plaintiff] characterize[d] his claim as one for 'wrongful discharge' " made no difference. (*Id.* at pp. 323-324 [32 L.Ed.2d at p. 99].) This was true even though the plaintiff sought damages rather than reinstatement.

■ *Andrews* teaches that one must look to the substance of the claim, not its characterization, to determine whether an action is preempted. This is so even where the alleged tort is for other than wrongful discharge. A leading case on point is *Magnuson* v. *Burlington Northern, Inc.* (9th Cir. 1978) 576 F.2d 1367. In that case the employee, a train dispatcher, was on duty when a fatal accident occurred. The employer conducted an investigation and hearing, as required by the collective bargaining agreement. The employee was found responsible for the accident and was discharged. He then filed an action seeking damages for intentional infliction of emotional distress based on the railroad's alleged conspiracy to cover up the negligence of its supervisory employees by making him the scapegoat.

The *Magnuson* court held that, in determining whether or not a purported tort claim is in substance a minor dispute, courts should look to whether or not the conduct complained of is " 'arguably' governed by the collective bargaining agreement or has a 'not obviously insubstantial' relationship to the labor contract." (*Magnuson, supra,* 576 F.2d at pp. 1369-1370.) In either case, such a complaint involves a minor dispute which must be arbitrated under the RLA. (*Id.* at p. 1369.)

Applying the foregoing tests, the *Magnuson* court determined that Magnuson's action for emotional distress was barred. All of Magnuson's claimed damages flowed from his wrongful dismissal from employment. The employer's allegedly tortious acts involved abuse of the investigatory process and presentation of false evidence at the hearing that led to Magnuson's discharge. Both the investigation and hearing were required by the collective bargaining agreement as a prerequisite to discipline. Thus, Magnuson's action was based on a "matrix of facts" which was "inextricably intertwined" with the grievance machinery of the collective bargaining agreement and the RLA. (576 F.2d at p. 1369.)[9]

The *Magnuson* rule—that an action is preempted if the conduct underlying it is "arguably governed by" or has a "not obviously insubstantial rela-

---

[9] At least one court in this state has adopted the *Magnuson* test. In *Miller* v. *United Airlines, Inc.* (1985) 174 Cal.App.3d 878 [220 Cal.Rptr. 684], an airline stewardess filed an action against the airline for, inter alia, intentional infliction of emotional distress, defamation, and invasion of privacy. The conduct complained of—allegedly falsified work critiques and verbal harassment—took place during an investigation conducted by the airline pursuant to the collective bargaining agreement. The court correctly held that the causes of action were inextricably tied to the agreement, and thus were minor disputes properly resolved by arbitration, and were preempted by the RLA from judicial adjudication. (*Id.* at p. 889.)

tionship to" the collective bargaining agreement—has been followed in numerous federal and state courts in a variety of contexts. (See, e.g., *Stephens* v. *Norfolk & W. Ry. Co.* (6th Cir. 1986) 792 F.2d 576, 580 [civil rights of the handicapped]; *Jackson* v. *Consolidated Rail Corp.* (7th Cir. 1983) 717 F.2d 1045, 1053 [Federal Employer's Liability Act]; *Beers* v. *Southern Pacific Transp. Co.* (9th Cir. 1983) 703 F.2d 425, 428-429 [intentional infliction of emotional distress]; *Schroeder* v. *Trans World Airlines, Inc.* (9th Cir. 1983) 702 F.2d 189, 192 [wrongful termination]; *Gray* v. *Chessie System* (D.Md. 1984) 588 F.Supp. 1334, 1337 [intentional interference with contractual relations]; *Schwadron* v. *Trans World Airlines, Inc.* (W.D. Pa. 1984) 585 F.Supp. 1371, 1373-1374 [negligent misrepresentation]; *Spencer* v. *Missouri Pacific R. Co.* (E.D. Mo. 1984) 581 F.Supp. 1220, 1221 [conspiracy to interfere with employment rights]; *Majors* v. *U. S. Air, Inc.* (D.Md. 1981) 525 F.Supp. 853, 857 [defamation, false imprisonment]; *Carson* v. *Southern Ry. Co.* (D.S.C. 1979) 494 F.Supp. 1104, 1112 [defamation]; *Downing* v. *The Travelers Ins. Co.* (1984) 107 Idaho 375 [691 P.2d 375, 381] [entitlement to death benefits]; *Burkin* v. *Burlington Northern R.R. Co.* (Mo. App. 1985) 690 S.W.2d 508 [emotional distress, wrongful discharge]; *Gonzalez* v. *Northwest Airlines, Inc.* (1985) 201 N.J. Super. 422 [493 A.2d 547, 550] [wrongful discharge].)

The *Magnuson* rule is consistent with the United States Supreme Court's recent decision in *Allis-Chalmers Corp.* v. *Lueck* (1985) 471 U.S. 202 [85 L.Ed.2d 206, 105 S.Ct. 1904] concerning the effect of section 301 of the Labor Management Relations Act (LMRA) (29 U.S.C. § 185(a)). The court there stated, "If the policies that animate § 301 are to be given their proper range . . . the pre-emptive effect of § 301 must extend beyond suits alleging contract violations." (*Id.* at p. 210 [85 L.Ed.2d at p. 215].) It must also extend to state claims, the evaluation of which is inextricably intertwined with a consideration of the terms of the collective bargaining agreement. (*Id.* at p. 211 [85 L.Ed.2d at p. 216].)

Like the United States Supreme Court, we believe that, if the policies underlying the RLA are to be given their proper force, the preemptive effect of the Act cannot be limited to suits alleging contract violations.[10] If an employee can institute a civil action, in essence litigating the questions at issue in an arbitration, the value of arbitration as a dispute resolution tool will be undermined. Further, if the courts can be used as forums to resolve arbitrable disputes, employees can make an end run thereby avoiding the carefully crafted congressional procedures set forth in the RLA. These results cannot be squared with federal policy.

---

[10] Indeed, arguably the case for insisting on resort to arbitration and grievance procedures is stronger in cases arising under the RLA than it is in cases arising under section 301 of the LMRA. (*Andrews, supra,* 406 U.S. at p. 323 [32 L.Ed.2d at pp. 98-99]. But see *Lancaster* v. *Norfolk and Western Ry. Co.* (7th Cir. 1985) 773 F.2d 807.)

■ We conclude, therefore, that the *Magnuson* approach is the correct one. RLA preemption must, as the *Magnuson* court stated, extend to any claim premised on facts inextricably intertwined with matters subject to the grievance procedures of the collective bargaining agreement. To adjudicate such issues would necessarily involve interpretation of the agreement, which a court is without jurisdiction to do. Mere theoretical legal independence is not enough to save a purported tort cause of action from preemption under the RLA. Instead, it must appear from the plaintiff's complaint that the facts on which the cause of action is premised either: (1) are unrelated to matters expressly or impliedly governed by the collective bargaining agreement; or (2) so far exceed the scope of reasonable conduct in the context of such matters that reference to the collective bargaining agreement is unnecessary to resolve the claim.[11]

Here, in rejecting Pan Am's preemption contention the Court of Appeal relied heavily on *Raybourn* v. *Burlington Northern Ry. Co.* (W.D.Mo. 1985) 602 F.Supp. 385. In *Raybourn,* when an employee sleeping on duty was awakened, he showed marked signs of drunkenness and admitted having consumed a half pint of liquor late the previous night. Pursuant to company policy, the employer's agents took him to a hospital for a blood alcohol test. When he refused to be tested, the agents called the police and requested that they escort the employee home. A heated argument broke out between the employee and the agents, whereupon the police arrested the employee for disorderly conduct. The employee was subsequently discharged. After unsuccessfully seeking reinstatement via the grievance procedures established in the collective bargaining agreement, the employee filed suit against his employer, alleging false arrest and imprisonment and wrongful institution of arrest.

The *Raybourn* court rejected the employer's RLA preemption argument on grounds the claim was "legally independent of any contractual claims or grievances he may have...." (602 F.Supp. at p. 387.) In so doing, the court

---

[11] For example, some courts have concluded that Federal Employers' Liability Act (FELA) (45 U.S.C. §§ 51-60) claims premised on physical injury are not preempted. (See, e.g., *Lancaster* v. *Norfolk and Western Ry. Co., supra,* 773 F.2d 807; *Buell* v. *Atchison, Topeka and Santa Fe Ry. Co.* (9th Cir. 1985) 771 F.2d 1320, cert. granted (1986) 476 U.S. 1103 [90 L.Ed.2d 356, 106 S.Ct. 1946].) At least one case has held that state tort causes of action premised on an employer's attempt to prevent his employee from retaining counsel to process a FELA claim were sufficiently independent from the collective bargaining agreement so as not to be preempted by the RLA, as nothing in the agreement remotely related to whether or not one could retain counsel to pursue FELA claims. (See *Balzeit* v. *Southern Pacific Transp. Co.* (N.D.Cal. 1983) 569 F.Supp. 986, 990.) Similarly, another case has held that state court jurisdiction over claims by former employees for alleged intentional infliction of emotional distress was not preempted by either the RLA or the FELA, when the distress was based on a continual and egregious pattern of harassment by the employer. (*Pikop* v. *Burlington Northern R. Co.* (Minn. 1986) 390 N.W.2d 743.)

failed to follow the dictates of *Andrews, supra,* 406 U.S. 320, and *Magnuson, supra,* 576 F.2d 1367, and did not analyze the substance of the claim, rather than its terminology, to determine whether it was in fact premised on the collective bargaining agreement or inextricably intertwined with its grievance machinery. Instead, the court simply stated, in a conclusory fashion, that since the employee's claim was a "typical tort claim," it was not preempted. The weight of authority follows *Magnuson* and is contrary to *Raybourn.* We believe the *Magnuson* rule is more persuasive and should be followed.

■   The facts in the case at bench fall squarely within the ambit of *Magnuson.* Here, as previously noted, the collective bargaining agreement *required* that an investigation and hearing take place before an employee could be discharged or disciplined. When Pan Am learned of what appeared to be a theft in which DeTomaso may have been implicated, it conducted the required investigation and held a hearing before determining whether to discharge or discipline him. DeTomaso complains of the statements made during both the investigation at his garage and the subsequent courtesy calls to Chandiramani, and of Startzell's statement at the January 1979 meeting. However, all these acts were inextricably intertwined with the investigation and discharge procedures mandated by the agreement. Indeed, all of the alleged wrongful conduct took place during the ordinary course of these proceedings.

In our view, the investigator's statements in the garage cannot form the basis for liability. The conduct complained of took place during the course of, and as part of, an investigation mandated by the collective bargaining agreement. The parties to such an agreement must be allowed to perform their duties without judicial interference in all but the most outrageous of cases. We do not find that the acts complained of establish such an outrageous case. Additionally, the conduct of the investigation was itself subject to the collective bargaining agreement's grievance adjustment procedure, since it was, in the language of the contract, a provision of that agreement which DeTomaso evidently believed had "not been properly applied." Thus, the abuses alleged by DeTomaso were remediable, if at all, only through the grievance and arbitration provisions of the collective bargaining agreement. For the jury or a court to second guess whether the required investigation was "reasonable" under the circumstances here would undermine the exclusiveness of those procedures. (See *Magnuson, supra,* 576 F.2d at p. 1369; *Seid* v. *Pacific Bell, Inc.* (S.D. Cal. 1985) 635 F.Supp. 906, 909 [121 LRRM 2349, 2353].) This we cannot do.[12]

---

[12] DeTomaso argues that since the genesis of the controversy was the purchase and sale of the salvage bins, his tort claims stem not from the employment relationship, but from the vendor-vendee relationship. Such a characterization is entirely implausible in light of the fact that *none* of the alleged misconduct occurred in the course of the sale or was related to it in more than an extremely tangential sense. Instead, the conduct complained of occurred in the course of a legitimate investigation of what reasonably appeared to Pan Am to have been a cargo theft in which DeTomaso might have taken part.

Similarly, statements made to the union representative or during formal or informal disciplinary hearings cannot support a cause of action. There can be no doubt that the statements made by Pan Am to the union representative in the context of a disciplinary investigation are privileged and cannot form the basis for liability at law, whether or not they were made during an actual grievance proceeding. (See *Hasten* v. *Phillips Petroleum Co.* (10th Cir. 1981) 640 F.2d 274, 278; *General Motors Corporation* v. *Mendicki* (10th Cir. 1966) 367 F.2d 66, 71.) Moreover, as previously discussed, the reasonableness of the investigation and hearings was a question subject to the agreement's grievance and arbitration provisions. DeTomaso's remedy was in the forum provided for in the agreement.

We are not persuaded that the allegation of defamation, whether it concerns Startzell's statement in the garage or statements made during the formal or informal disciplinary procedures, brings Pan Am's conduct into the realm of actions that so far exceed the scope of reasonable conduct that reference to the agreement is unnecessary.[13] Under the agreement, Pan Am could not impose discipline without cause. It was therefore necessary for the employer to prove some act by DeTomaso establishing that cause; specifically, Pan Am had to prove that DeTomaso wrongfully obtained the batteries. Yet that allegation was the substance of the comments DeTomaso alleges to be defamatory. As truth is a defense to defamation, the question of whether DeTomaso stole the property in question would be at issue in the tort case as well as in the arbitration. In the context of the employer's investigation, the very allegations that form the basis of the inquiry, which may lead to disciplinary action, cannot be the predicate for the outrageous conduct on which the state tort action is based. (*Farmer* v. *Carpenters, supra,* 430 U.S. 290, 305 [51 L.Ed.2d 338, 353].) The situation would, of course, be different if Pan Am's agents had physically assaulted DeTomaso or accused him of murder rather than theft.

DeTomaso unsuccessfully attempts to escape the effect of *Andrews, supra,* 406 U.S. 320, and *Magnuson, supra,* 576 F.2d 1367, by relying on *Farmer* v. *Carpenters, supra,* 430 U.S. 290, decided under the National Labor Rela-

---

[13] In addition, even if DeTomaso could allege an action for defamation, it is likely that he would have to prove "actual malice" as defined in *New York Times* v. *Sullivan* (1964) 376 U.S. 254 [11 L.Ed.2d 686, 84 S. Ct. 710, 95 A.L.R.2d 1412]. (*Farmer* v. *Carpenters* (1977) 430 U.S. 290, 298-299 [51 L.Ed.2d 338, 349, 97 S.Ct. 1056]; *Linn* v. *United Plant Guard Workers* (1966) 383 U.S. 53, 65-66 [15 L.Ed.2d 582, 591, 86 S.Ct. 657].) The *New York Times* standard applies to assure that the robust speech often occurring in the labor context does not become the basis for judicially imposed liability. The jury in the instant case was not so instructed. We note in passing that the facts alleged here cannot possibly meet that standard. For example, having just discovered the missing batteries in DeTomaso's garage, it is inconceivable that Startzell's accusation was made with knowledge of its falsity or reckless disregard as to whether it was true or false.

tions Act (NLRA). In *Farmer,* union officials subjected plaintiff, a member of the union, to a campaign of personal harassment including frequent public ridicule and incessant public abuse and intentionally engaged in outrageous conduct, threats, and intimidation. The United States Supreme Court held that Farmer's court action was not preempted by the NLRA, even though the union's conduct could arguably be characterized as an unfair labor practice. The court determined that there was little danger that judicially imposed liability for the alleged union misconduct would interfere with federal labor policy. Indeed, the acts complained of were only of "peripheral concern" to any federal labor interest. In contrast, the state was found to have a great interest in proscribing the alleged conduct. The court also noted that plaintiff's claim did not involve an arbitrable grievance under a collective bargaining agreement, and so preemption under section 301 of the LMRA was not at issue. (*Id.* at p. 303, fn. 12 [51 L.Ed.2d at p. 352].)

Because the case at bench does concern a collective bargaining agreement, *Farmer* does not control here. Where an employee through a collective bargaining agreement has an alternative to litigation, an additional important federal policy is implicated, specifically that of enforcing labor arbitration agreements under the LMRA or the RLA. If such an avenue is available, it will usually constitute the only avenue of redress. DeTomaso had such an avenue available and in fact used it to regain his employment from Pan Am. Pan Am's investigation was mandated, and so governed, by the collective bargaining agreement. Thus, he could have and should have sought relief through the grievance procedure.

Even aside from the strong federal interest in enforcing arbitration provisions in employment contracts, *Farmer* does not apply to the case at bench. *Farmer* held that state court actions could be adjudicated only where resolution of the case could be had without resolving the "merits" of the underlying labor dispute. (*Id.* at p. 304 [51 L.Ed.2d at pp. 352-353].) Here, the question of how in fact DeTomaso came into possession of the property, i.e., whether a theft occurred, is the principal issue that was to be adjudicated by the adjustment board. If there was no wrongful conduct, there could be no basis for termination under the agreement.

In addition, the factual setting in *Farmer* is readily distinguishable from the case at bench. Certainly California has an interest in punishing defamatory statements and intentional inflictions of emotional distress, as it has in proscribing all tortious conduct. However, the acts alleged by DeTomaso do not rise to the level of those alleged in *Farmer*. In stark contrast to the extreme misconduct by the union officials alleged there, Pan Am's agent is alleged to have accused DeTomaso of theft during a mandated investigation concerning theft. As we have already noted, statements made to the union

representatives or during disciplinary hearings are protected as a matter of strong federal policy. The remaining alleged conduct is hardly so "outrageous that 'no reasonable man in a civilized society should be expected to endure it.'" (*Id.* at p. 294 [51 L.Ed.2d at p. 346].)

In sum, because the investigation giving rise to and forming the basis of the allegedly offensive conduct was required by the collective bargaining agreement, the risk of judicially imposed liability for it cannot be said to be merely "peripheral" to federal labor policy. DeTomaso's exclusive remedy was in the grievance adjustment procedures designated by the collective bargaining agreement for resolution of disputes stemming from an employee's belief "that he has been unjustly dealt with or that any provision of [the] Agreement has not been properly applied or interpreted." The Court of Appeal erred in concluding otherwise.

As we have noted earlier, the jury's verdict does not reveal whether the tort or warranty theory formed the basis for its imposition of liability on Pan Am, nor how damages were allocated, if at all, between the two theories. Generally, "[w]here there are several counts or causes of action, a general verdict will stand if the evidence supports it on any one sufficient count." (7 Witkin, Cal. Procedure (3d ed. 1985) Trial, § 331, p. 332.) The evidence in this case, however, clearly cannot support the damage award based solely on the breach of warranty cause of action. It is, therefore, necessary to remand the case for retrial on the breach of warranty cause of action. Accordingly, the Court of Appeal's judgment—setting aside the trial court's order granting Pan Am a new trial and affirming and reinstating the trial court's judgment—is reversed. The Court of Appeal is directed to enter a new judgment consistent with the views expressed herein, to determine the right to costs on appeal, and to remand this case to the trial court for a new trial on the breach of warranty cause of action.

Lucas, C. J., Mosk, J., and Broussard, J., concurred.

Appellant's petition for a rehearing was denied April 22, 1987.